─────────────TRANSCRIBED FROM DIGITAL RECORDING─────────────

1          UNITED STATES DISTRICT COURT

2             DISTRICT OF NEVADA

3

4  KATHRYN MAYORGA,              )
                                 )  Case No. 2:19-cv-00168-JAD-DJA
5         Plaintiff,             )
                                 )  Las Vegas, Nevada
6         vs.                    )  Friday, September 17, 2021
                                 )  Courtroom 3A
7  CRISTIANO RONALDO,            )
                                 )  Motion Hearing
8         Defendant.             )
                                 )  **C E R T I F I E D   C O P Y**
9  _____)

10

11              TRANSCRIPT OF PROCEEDINGS

12       BEFORE THE HONORABLE DANIEL J. ALBREGTS
              UNITED STATES MAGISTRATE JUDGE
13

14

15

16

17  APPEARANCES:              See next page

18

19  DIGITALLY RECORDED:       Liberty Court Recorder (LCR)
                              11:05 a.m. - 12:38 p.m.
20

21  RECORDED BY:              Jerry Ries

22

23  TRANSCRIBED BY:           Samantha N. McNett
                              Samantha_McNett@nvd.uscourts.gov
24

25  Proceedings recorded by electronic sound recording; transcript
    produced by machine shorthand and computer-aided transcription.

─TRANSCRIBED FROM DIGITAL RECORDING─

1  <u>APPEARANCES</u>:

2  For the Plaintiff:

3       **LESLIE M. STOVALL, ESQ.**
        2301 Palomino Lane
4       Las Vegas, Nevada 89107
        702-258-3034
5

6  For the Defendant:

7       **KENDELEE L. WORKS, ESQ.**
        **PETER S. CHRISTIANSEN, ESQ.**
8       CHRISTIANSEN TRIAL LAWYERS
        710 South 7th Street, Suite B
9       Las Vegas, Nevada 89101
        702-240-7979
10
                                   *  *  *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
──── TRANSCRIBED FROM DIGITAL RECORDING ────
```

 1          LAS VEGAS, NEVADA; FRIDAY, SEPTEMBER 17, 2021; 11:05 A.M.

 2                              --oOo--

 3                      P R O C E E D I N G S

 4          THE COURTROOM ADMINISTRATOR:  Kathryn Mayorga versus

 5   Cristiano Ronaldo, 2:19-cv-168-JAD-DJA.  This is before the

 6   Court on motions dockets 111, 112, 113, 115, and 124.

 7          Counsel, please make your appearance for the record.

 8          MS. WORKS:  Good morning, your Honor.  Kendelee Works

 9   and Pete Christiansen on behalf of Cristiano Ronaldo.

10          THE COURT:  Good morning.

11          MR. STOVALL:  Leslie Stovall for the plaintiff.

12          THE COURT:  Good morning.

13          MR. STOVALL:  Good morning.

14          THE COURT:  All right.  Let me get my paperwork here

15   in order.

16          So the parties know, my staff and I have been fully

17   vaccinated.  Obviously, I agree with our chief's order

18   regarding the mask mandate.  As you saw, I had it on when I

19   came out.  I will keep it off during the hearing.  We are going

20   to be far enough apart.  Of course, I don't have any symptoms,

21   and being fully vaccinated, I think I'm fine.  I assume the

22   parties won't have a problem with that.

23          I won't ask you to come to the podium if you don't

24   want to.  You can just argue from counsel table.  And if you

25   would like to do it with your mask on or off, I'll leave that

TRANSCRIBED FROM DIGITAL RECORDING

1  to you, as well.

2          As you can see, in the new world -- that's fine if

3  you're vaccinated and want to take it off.  That's fine, as

4  well.  And in the new world, we have bottled water as opposed

5  to the community water.

6          Mr. Stovall, do you want to make a comment about the

7  mask issue or COVID protocols?

8          MR. STOVALL:  No.  I understand while sitting here

9  during argument, I can be unmasked.

10          THE COURT:  Yes.  Yes.

11          MR. STOVALL:  Okay.  For the record, I've had my

12  vaccinations.

13          THE COURT:  All right.  All right.  Thanks.

14          MR. STOVALL:  Yeah.

15          THE COURT:  All right.  Let me take a look here and

16  let you know what we're going to do and in what order.  So I

17  intended -- well, let me back up.

18          As my clerk indicates, we're here on 111 and 112 which

19  are essentially the same thing, 112 being the redacted version

20  of the motion for sanctions.

21          I am not going to rule today from the bench on that

22  one.  I'm going to take that under advisement.  I'm going to

23  want to hear from the parties on a number of issues and I will

24  take that one last.  And just so you know, we'll be issuing an

25  order or report recommendation depending on which way it falls.

—TRANSCRIBED FROM DIGITAL RECORDING—

1            On 113, that's the defendant's motion to seal with the

2    response at 126 and the reply at 132.

3            At 124 -- 115 is the motion to extend the time for

4    discovery.  Response is the -- defendant's response is at 116

5    and the reply is at 120.

6            And then the motion for in-camera review is 124.

7    Defendant's response is 134 and the reply is 138.

8            I intend to rule from the bench on those three so that

9    you'll have an answer on those today.  I think it's obvious why

10   those are a little less complicated than the other ones.

11           I will entertain real brief argument on those, but

12   I'll try to direct you where I want that on those three before

13   we get into what I think is obviously the most meaty motion

14   which is the motion for sanctions.

15           So why don't we address 115 first, which is the motion

16   to extend the time to respond to discovery.  The way I see this

17   is essentially what the parties are asking -- or at least the

18   plaintiff is asking the Court to do is to extend the time for

19   the discovery cut-offs to June 8th, which would be an extension

20   of six days which is when they were delivered, and essentially,

21   if I do that, discovery would then be closed and those matters

22   would be deemed timely.  Obviously, if I didn't do that, and I

23   think what is underlying the motion itself is whether or not --

24   if I don't do that, whether there -- or those would be deemed

25   admitted.

TRANSCRIBED FROM DIGITAL RECORDING

1          So let me summarize your arguments and the law, tell

2    you what my thoughts are and then see if you want to add

3    anything.

4          As I indicated, the plaintiffs were originally to

5    respond to the discovery requests on June 2, 2021.  And

6    apparently, plaintiff e-mailed defense counsel that they were

7    going to meet the deadline that afternoon, but apparently when

8    preparing with the plaintiff that afternoon and into the

9    evening, given what was occurring, plaintiff's counsel decided

10   to stop the session with the plaintiff so that they could not

11   respond to those discovery requests.

12         According to the documents, plaintiff decided it was

13   too late to e-mail defendant -- defense counsel to ask for an

14   extension and instead started working on the motion to extend.

15         Defense opposes the motion to extend arguing that the

16   plaintiff did not meet and confer pursuant to the local rules

17   before filing the motion.  Plaintiff's counsel then delivered,

18   while these motions were being done, the discovery responses on

19   June 8th.

20         Plaintiff's counsel apparently asked defense counsel

21   to agree to extend the time to respond to June 8th and render

22   the motion moot.  Apparently defense counsel responded that

23   they did not want to waive their client's right to have the

24   answers deemed admitted and would not agree.  And so we are

25   here on the motion to extend the discovery response on those

—TRANSCRIBED FROM DIGITAL RECORDING—

1   responses received on June 8th.

2          The Court knows -- or as the parties know, under

3   Federal Rule of Civil Procedure 36(a)(3), a matter is deemed

4   admitted if a party misses the 30-day deadline in answering a

5   discovery request.  However, 36(b) gives the Court discretion

6   to grant a party relief for the admission if, number one, it

7   would promote the presentation of the merits of the action, and

8   number two, if the Court is not persuaded that it would

9   prejudice the requesting party in maintaining or defending the

10  action on the merits.

11         So as I see it, then the issue is whether or not I'm

12  going to extend the time and therefore they would not be deemed

13  admitted or whether I deny that request in which case the --

14  the discovery requests would be deemed admitted.

15         Is there anything -- I think I've summarized it,

16  Mr. Stovall, for what I need to consider here today.  Is there

17  anything on that issue that you want to let me know or that you

18  think should be brought to my attention?

19         MR. STOVALL:  No.  No, your Honor.  We submit it.

20         THE COURT:  All right.  Anything else, Ms. Works or

21  Mr. Christiansen?

22         MS. WORKS:  (Unintelligible) on the briefing.

23         THE COURT:  All right.  Well, I will find in this

24  instance good cause to extend the deadline to June 8th using

25  the discretion given to me under Rule 36.  I find deeming them

TRANSCRIBED FROM DIGITAL RECORDING

1  admitted to be harsh given the facts and circumstances.  I do

2  find that if I granted, I am promoting the presentation of the

3  case on its merits and I don't find that there's prejudice to

4  the defense other than the prejudice that (unintelligible) that

5  I'm not getting them admitted, which is prejudice.  But I don't

6  find any other prejudice given the six days such that I should

7  deny the request and deem them admitted.  I just did not see

8  compelling reasons to deem them admitted given the nature of

9  what those requests were.

10        And so I will grant plaintiff's motion to extend the

11  time to respond to the discovery requests at 115 and will find

12  that they were timely given, that they were submitted on

13  June 8, 2021.

14        I will remind counsel that needing to prepare these on

15  the day that they are due is probably not the best practice

16  given what happened here.  It doesn't allow for enough time to

17  meet and confer and address these issues.  And I do see that

18  there seems to be a little bit of a trend in terms of meeting

19  these deadlines and the like with this case.

20        And so I would direct in the future, Mr. Stovall, that

21  we try to get these things a little sooner so that we don't run

22  into these sort of situations.  But that will be the ruling on

23  115.

24        Let's go to 113 which is the defendant's motion to

25  seal.  As I indicated, the response is at 126 and a reply at

————— TRANSCRIBED FROM DIGITAL RECORDING —————

1   132.

2          Essentially, the defense is requesting that what we've

3   deemed the Football Leaks documents contained in plaintiff's

4   production and in the LVMPD file as Exhibits D and P that are

5   attached to their motions for sanctions, that those documents

6   be sealed.  And they've also declared a declaration from

7   Mr. Ronaldo's attorney at Exhibit W attesting to the security

8   measures that the attorney's office had in place when this hack

9   apparently happened that led to the confidential and privileged

10  documents being stolen and they're requesting that Exhibit W be

11  sealed, as well.

12          And they seek to seal those exhibits, as I've

13  indicated, and then ten lines in their motion where they quote

14  from those exhibits.

15          I would note that earlier in the case, Judge Dorsey

16  denied the defense's request to seal the entire case.  That was

17  at ECF number 23.  But in that order, Judge Dorsey found that

18  some documents, including the settlement agreement, the

19  associated signed agreement, and direct quotes from them should

20  remained sealed.  And as I previously recommended -- a

21  recommendation that Judge Dorsey accepted -- we found that

22  certain Football Leak documents should be stricken from one of

23  the plaintiff's responses.  And that was in ECF number 67.

24          Plaintiff opposes defendant's motion to seal those

25  documents arguing that they are seeking reconsideration of

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

1   Judge Dorsey's order denying their request to seal the entire

2   case.  And that order I referenced from Judge Dorsey was number

3   23.

4           So as I see the summary of the law, if a party seeks

5   to seal judicial records in connection with the dispositive

6   motion or a motion "more than tangentially related to the

7   merits of the case," that party must meet "the compelling

8   reasons" standard.  And that's Kamakana versus City and County

9   of Honolulu, 447 F.3d 1172.  My quotes come from page 1178

10  through 79.  That's a Ninth Circuit case, 2006.  Also, as the

11  parties know, Center for Auto Safety versus Chrysler Group,

12  LLC, 809 F.3d 1092 at 1101, Ninth Circuit, 2016.  Both support

13  that proposition.

14          Here, the compelling reasons standard applies because

15  defendants seek case dispositive sanctions and plaintiff

16  asserts that the documents over which the parties have filed

17  these motions are related to the plaintiff's capacity to

18  contract.

19          I do believe that the compelling reasons to seal

20  judicial documents can include when the documents are used for

21  improper purposes, to promote public scandal, gratify spite,

22  circulate libelous statements.  Embarrassment, incrimination,

23  or exposure to further litigation are not enough.  And, again,

24  that comes directly from Kamakana at pages 1178 through 79.

25          And then our court here has previously accepted the

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1  attorney/client privilege and work product doctrine as

2  compelling reasons to seal documents.  And I would point

3  parties to Asdale versus International Game Technology.  That's

4  a 2010 Westlaw case, 2161930 at note 5, and that's from May 28,

5  2010.

6          And I will let the parties know that I don't see this

7  as a situation where the defense is trying to relitigate Judge

8  Dorsey's prior order.  I don't see them trying to seal the

9  entire case, just the three documents or exhibits that I've

10  outlined, D, P, and W.  And at this stage, I'm inclined to

11  think they've shown compelling reasons to seal those documents.

12          But I'll hear, you know -- well, actually, Ms. Works,

13  this is your motion so I'll hear from you if you think there's

14  anything else that I should know given my comments about which

15  way I'm leaning.

16          MS. WORKS:  Given the Court's comments, your Honor, we

17  would submit it on the brief, as well.

18          THE COURT:  All right.  And Mr. Stovall, anything else

19  you want to add or address as it relates to the sealing of

20  those documents?

21          MR. STOVALL:  No, your Honor.

22          Although, I think the rulings on these other matters

23  may have some effect depending on how the Court decides.

24          THE COURT:  Right.  Well -- and I'm not going to make

25  a decision on the attorney/client privilege at this stage one

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   way or the other.  I think that's probably left for the other

2   motion.

3           But at this stage, I do think that the defense has

4   made an argument that the documents are privileged.  It does

5   look on their face like they are between attorneys,

6   attorney/client documents.  We have already decided to strike

7   the documents from another filing so in order to protect the

8   defendant's attorney from potential future hacks as well, that

9   document has attorney/client privilege information as well and

10  I think we should certainly seal that as well given it contains

11  information and explanation for the type of security measures

12  that he has in place as outlined in Exhibit W.  So I do find

13  that compelling, as well.

14          And so I find that the defense has carried the burden

15  of showing that there are compelling reasons why these

16  documents should be sealed and so I will grant the defendant's

17  motion to seal found at 113.  Exhibits D, P, and W to their

18  motions for sanctions found at 111 shall remain sealed.  And

19  again, I -- that's simply on the sealing issue and not on

20  anything else as to the nature of those documents.

21          All right.  Let's move then to number 124 which is the

22  plaintiff's motion for in-camera review of documents.

23          Now, plaintiff is arguing in response to the

24  defendant's motion for sanctions that this Court should review

25  the Football Leak documents in-camera to decide whether the

————— TRANSCRIBED FROM DIGITAL RECORDING —————

1   crime fraud exception to the attorney/client privilege applies.

2           Essentially, the plaintiff argues that the Football

3   Leak documents show that defendant and his attorneys were

4   shielding the defendant's criminal conduct and perhaps

5   prosecution by the LVMPD for that conduct by negotiating and

6   entering into the settlement agreement, and therefore, requests

7   that I review those in-camera to determine whether or not the

8   crime fraud exception exists.

9           Defendants object arguing that the plaintiff already

10  has reviewed and used the Football Leak documents so their

11  request for an in-camera review is too late.

12          They also argue that plaintiff has already

13  unsuccessfully argued crime fraud because Judge Dorsey

14  overruled their objection containing that argument and the

15  order adopting the report and my recommendation at number 72.

16          Defendant also objects that the evidence plaintiff

17  uses to ask the Court to review these documents do not meet the

18  fraudulent scheme standard.

19          And then finally, the defense objects that the alleged

20  criminal conduct -- that is the sexual assault -- took place

21  and ended before the defendant began using lawyers to negotiate

22  a settlement so that he's not using the attorney/client

23  privilege to shield ongoing conduct.

24          So briefly, the crime fraud exception provides that

25  the attorney/client privilege does not apply to the

TRANSCRIBED FROM DIGITAL RECORDING

1   communications made for the purpose of getting advice for the

2   commission of a fraud or a crime.  That's pretty -- pretty old

3   and standard law, but it started with United States of America

4   versus Zolin, 491 U.S. 554 and 562, 1989 case.

5        And certainly while the Court may review privileged

6   documents in-camera to decide whether the crime fraud exception

7   applies, in-camera review is typically conducted when one party

8   has the documents and the other party doesn't.  It usually

9   occurs in settings where the party that doesn't wants the Court

10  to review these documents to determine whether or not they're

11  entitled to them or perhaps the party who has them wants to

12  give it to the Court to let the Court see them and say this is

13  why they shouldn't get them and then the Court makes that

14  in-camera determination.

15       Again, in criminal cases, the context comes up often

16  where the Government is seeking to protect people or protect

17  investigations and gives it to the Court so the Court can make

18  a determination.  And again, that's when the Court does not

19  already have those documents.

20       But here, I've already reviewed them in-camera because

21  they've already been provided to the Court and multiple

22  documents related to multiple arguments.  Both sides have

23  access to it so it's not up to the documents.  It's not like

24  one side has it or the other side doesn't have it.  In fact, I

25  think they're attached in their entirety as Exhibits D and P,

--- TRANSCRIBED FROM DIGITAL RECORDING ---

1  which I just sealed.  So I've had access to them.  So I'm

2  trying to find why I need to do any further in-camera

3  inspection or review of the documents when we've already done

4  that.

5          Now, I suspect, Mr. Stovall, at the time you filed

6  that, perhaps you didn't know or realize the extent to which we

7  would have those documents already, but I think this is already

8  moot because I've already reviewed them in-camera.

9          MR. STOVALL:  Well, your Honor, the application of the

10  crime fraud exception extends beyond just the Football Leak

11  documents.  What we're talking about is all communications and

12  documents exchanged -- not exclusive, not inclusive of these --

13  between these parties if this Court were to determine that what

14  was happening was the defendant and his attorneys were engaged

15  in compounding or misprison of a felony.  And that is not the

16  rape.  It is the criminal prosecution.

17          So the -- part of the objection I understood from the

18  defense is, "Well, you can't look at the documents that have

19  been provided so far because those are within the

20  attorney/client privilege."

21          What we're really saying is that these documents that

22  you have, we would ask that you review them for purposes of

23  determining whether or not the defendant can shield itself on

24  all of its communications with its attorneys or between those

25  attorneys because of the nature of the communications that were

——————— TRANSCRIBED FROM DIGITAL RECORDING ———————

1   occurring.

2          And we've set forth the threshold -- we've identified

3   the documents and the correspondence which the plaintiff felt

4   met the threshold requirement for that purpose.

5          Now, there are cases -- I think Christiansen is one of

6   the cases where the Court didn't follow Zolin but said, "Yeah,

7   we didn't follow Zolin.  We're going to go back and take a look

8   and then make that determination."  And there's no reason this

9   Court cannot, at this time, make that -- use that process in

10  Zolin to determine -- make that determination.

11         And it's important in this case because that is really

12  the essential issue on sanctions.  The question becomes and

13  what the defendant has been arguing is -- and it's based on the

14  assertion that these documents are within the attorney/client

15  privilege.

16         If they're not, then their motion for sanctions fails.

17  If they are, then the Court should consider the standards for

18  whether or not sanctions should be applied or to what extent

19  they should be applied in this case.

20         But that central question becomes, are these documents

21  subject to the crime fraud exception, and if they are, do

22  they -- does the attorney/client privilege -- is it available

23  for the defendant to shield themselves from discovery of all

24  the communications between the defendant, the defense lawyers,

25  and between the defendant's lawyers and their representatives.

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1   Because, you know, we got some more lawyers involved in this

2   thing, too.

3          Now --

4          THE COURT:  Well, so the issue then is -- I mean, I

5   think I'm hearing you say there's two issues, and if I'm

6   hearing you correctly, I'm inclined to agree that there are two

7   issues.  That is, does -- does the crime fraud exception apply

8   in terms of the privileged nature of the communications.

9          MR. STOVALL:  Right.

10         THE COURT:  And obviously if it does, then their

11  motion for sanctions is far less -- is far weaker because

12  they're not privileged communications.

13         But the second issue is, you know, this idea that I

14  look at them in-camera.  Is there something that I haven't --

15  that hasn't been presented to me that you would want me to

16  review in-camera?  I just don't know that that's -- I mean, I

17  hear you.  That's the decision I have to make on the next

18  motion that I'm going to hear argument on.  But I don't know

19  that I need to have some sort of in-camera review of documents.

20         MR. STOVALL:  Well, I do, because our circuit, the

21  Ninth Circuit and the Supreme Court said that the Zolin steps,

22  the procedure under Zolin is required and --

23         THE COURT:  But I already have it all.  Don't I?  Is

24  there something I don't have?

25         MR. STOVALL:  No, you do.  You have everything I've

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1   got.  Right?  No, you do.  You have everything I've got and

2   everything I think the defense has at this point.

3           But the question becomes is whether or not the

4   process, the two-step process under Zolin has been complied

5   with so that on review, that doesn't become an issue.

6           And the process is first, is there a threshold -- did

7   the moving party meet the threshold for review of the

8   documents.  And we would ask the Court to make that

9   determination.  Yes, there is sufficient evidence that there

10  may have been -- that the crime fraud exception may apply to

11  allow for in-camera.  And then for the Court to make a finding

12  on the in-camera examination as to whether or not the crime

13  fraud exception applies.

14          So those are two different standards.  They're two

15  different things that the Court, I believe, is required to do

16  and that's what we're asking the Court do.  One, did we meet

17  the threshold.  That's step number one under Zolin.  Number

18  two, once the Court has examined, does the crime fraud

19  exception apply or does it not.

20          Those -- and so, yes, I'm very much aware that the

21  documents were in, but I think the case law here in the Ninth

22  recognizes that there's a two-step process, and if the Court

23  hasn't followed that two step process, that it should and it

24  can remedy it or can correct it for purposes of establishing

25  the record.  Yes, we met number one and here's the result on

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1   number two.

2           And I believe Christiansen speaks to that.

3           Does that answer?

4           THE COURT:  Well --

5           MR. STOVALL:  Well -- and I think there's a third

6   issue, your Honor, which is the scope of the application of the

7   crime fraud exception.  Should this Court find, for example,

8   that yeah, it appears to the Court that the crime fraud

9   exception applies, what -- what does it apply to?  We're not --

10  you know, the Football Leak documents within this case are

11  certainly at issue.

12          THE COURT:  Well, so what else -- so let's get that --

13  what documents are you -- so what I'm hearing is under the

14  Ninth Circuit case law, there's a two-step process, which --

15          MR. STOVALL:  Correct.

16          THE COURT:  -- you know, we all probably go through

17  anyway when we're doing in-camera review.

18          But first of all, what -- are there more than the

19  Football Leak documents that you're asking me to review?  I'm

20  not clear on that.

21          MR. STOVALL:  No.  What I'm saying to the Court and

22  what -- and I hope I may clarify this.

23          What I'm saying is these Football Leak documents

24  really are the opportunity for the Court to determine and we're

25  asking that the Court determine whether or not the

––––––––– TRANSCRIBED FROM DIGITAL RECORDING –––––––––

1   attorney/client privilege applies to any communications between

2   the defendant and the defendant's lawyers or between lawyers or

3   between their representatives.

4          THE COURT:  Aren't I going to do that in the sanction

5   motion anyway?

6          MR. STOVALL:  I don't know.  Because --

7          THE COURT:  Well, I am.

8          MR. STOVALL:  Okay.

9          THE COURT:  I mean, I think the analysis has to

10  contain -- because if they're not confidential, then my

11  concern -- you know, the concern I have as it relates to the

12  sanctions, and now I guess we're bleeding over into that

13  argument, but the concern I have obviously will be if these are

14  confidential attorney/client privilege documents that you

15  obtained that are privileged that aren't crime fraud exception

16  or anything else that you obtained, you know, and then used

17  entirely as a basis to reopen this case eight or nine years

18  later, that's much different to me than if there's a crime

19  fraud exception privilege and they're not privileged and

20  they're already out there in the public.  Then the actions of

21  an attorney are looked at much differently than if that

22  attorney somehow nefariously gained the attorney/client

23  (unintelligible).

24          MR. STOVALL:  That's correct.

25          THE COURT:  So that decision is going to be made in

1    the context of the sanctions motion.

2            MR. STOVALL:  I understand that, your Honor.

3            I'm -- my only concern is that the plaintiff is not

4    just speaking to the application of the attorney -- the crime

5    fraud exception with regards to the Football Leak documents

6    that have been identified within this case or disclosed in this

7    case.  There's a much broader issue.  And that is -- and is --

8    are any communications between the defendant and his lawyers

9    and between the defendant's lawyers and other representatives,

10   are any of those privileged.  I would argue they are not.

11           And my concern is this:  Let's say the plaintiff comes

12   through the motion for sanctions and eventually this case goes

13   to arbitration.  This Court's orders may restrict discovery in

14   arbitration and it's my understanding this Court has carved out

15   the question of legality of contract for arbitration along with

16   the other claims.  And the extent -- the orders that this Court

17   enters here may well be argued by the defense as limiting the

18   scope of discovery and arbitration.

19           Quite frankly, as I briefed to the Court, I thought

20   this issue had been disposed of, you know, that we had -- the

21   Court had carved out the capacity issue and said, "We're not

22   going to deal with anything else.  We're going to look at

23   capacity.  All this other stuff is going to go to arbitration

24   including crime fraud and illegality," and the Court deferred

25   the crime fraud exception argument not to encroach upon the

—TRANSCRIBED FROM DIGITAL RECORDING—

1   illegality of contract argument that was deemed to be

2   arbitrable.

3        THE COURT:  Let me ask you this.  Are you suggesting

4   that perhaps this -- I mean, I don't know that -- that this

5   issue should go before the arbitrator, whether or not --

6        MR. STOVALL:  Well, I had always -- well, yes, that

7   was my understanding before the motion for sanction was filed.

8        I really had not pursued these issues and stayed away

9   from these issues because I had understood this Court to have

10  carved out one issue and said stay away from everything else.

11  And it's logical.  It makes sense that the Court said, "I'm not

12  going to decide the crime fraud exception because if I decide

13  it, I essentially" -- the Court would essentially decide the

14  illegality of contract issue.

15       If this Court were to find crime fraud applies, then I

16  think that impacts the -- or decides the question of legality

17  of the contract.

18       THE COURT:  But I don't think you -- you didn't argue

19  in your response that this should be before the arbitrator, did

20  you?

21       MR. STOVALL:  Well, I did.

22       Well, I meant -- by -- perhaps I wasn't clear enough,

23  but if you read both of the oppositions to sanctions and the

24  motion to -- for in-camera, what I was trying to describe to

25  the Court is my view of what the standing orders in the case

——————— TRANSCRIBED FROM DIGITAL RECORDING ———————

1  had done that, they had carved out capacity and deferred crime

2  fraud and illegality.

3         And in fact, the Court, in deferring crime fraud -- a

4  decision on crime fraud, made a decision not to encroach on the

5  illegality of contract which was deferred to -- or found to be

6  arbitrable.

7         If you look at Rule -- court order 72, I -- and your

8  previous order, number 60, I think that's what you and Judge

9  Dorsey really decided that, "We're not going to get into that.

10 Let's take care of the capacity and you guys take all this

11 stuff over to arbitration."

12        And that's what concerned me about the defendant's

13 motion for sanctions is because, you know, I had this view

14 we're looking at capacity.  We're going to work towards that.

15 I had stayed away from the attorney/client privilege issue and

16 the crime fraud issue.  And, boom, we get this motion.  And --

17        THE COURT:  Well, so, do you think the arbitrator

18 would be able to toss this case based upon that motion?  Would

19 that be in the arbitrator's authority under the arbitration

20 provisions or is that something only the District Court can do?

21        MR. STOVALL:  No.  I think an arbitrator has the

22 opportunity to consider a motion for terminal sanctions, any of

23 the sanctions within the -- that are on issues that are

24 arbitrable.

25        I absolutely believe that the arbitrator can do that.

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1           THE COURT:  Well, so let me back up then and go back

2    to 124.

3           What I'm hearing you say is you think that under Zolin

4    and its progeny and the like, that I should be doing an

5    in-camera review to make a threshold requirement whether or not

6    the crime fraud exception applies and that's why I should do

7    this in-camera.

8           MR. STOVALL:  I think that the Court --

9           THE COURT:  And then I go to the next step and make a

10   decision later?

11          I mean, this first step, you think -- almost seems

12   like a prophylactic step that I -- when I've already seen all

13   these documents, I already have all these documents.  I don't

14   need to make an in-camera determination.  I'm going to make a

15   finding one way or the other as to whether -- or maybe a

16   recommendation --

17          MR. STOVALL:  Yeah.

18          THE COURT:  -- to Judge Dorsey one way or the other as

19   to whether the crime fraud exception applies.

20          So why do we need an extra step of an in-camera to

21   make a predetermination when that's ultimately the

22   determination I'm going to make?

23          MR. STOVALL:  My reading of Ninth Circuit decisions is

24   that they view Zolin as requiring the two steps to be complied

25   with, and the Ninth Circuit, when that has not been done, they

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1    have said, okay, it wasn't done but the District Court went

2    back and complied and made the Step 1 finding, even though they

3    looked at everything, and then made a decision on Step 2 and

4    that's okay.

5            So I read the Ninth Circuit cases as requiring that

6    two step, and really all I'm asking the Court to do is when you

7    are making your findings in this case, to make a finding on

8    Step 1 for the record and then make your finding on Step 2 --

9            THE COURT:  All right.

10           MR. STOVALL:  -- so that we avoid -- we avoid that

11   procedural problem if this case goes up to the Ninth.

12           THE COURT:  Part of my job is to avoid all those

13   (unintelligible).

14           So -- all right.  So let me hear from --

15           MR. STOVALL:  Sure.

16           THE COURT:  -- Ms. Works on the issue of that process.

17           And I'm inclined to just do it out an abundance of

18   caution and not rule on this and just incorporate it into my

19   ruling as it relates to the sanctions motion, but I'll hear

20   from you if you want to add something.

21           MS. WORKS:  Thank you, your Honor.

22           Your Honor, the problem here is plaintiff rendered

23   Zolin moot three years ago when plaintiff's counsel, on her

24   behalf, intentionally obtained these documents from a

25   third-party source and then relied on them throughout the

——— TRANSCRIBED FROM DIGITAL RECORDING ———

1   entirety of this case in bringing the action.

2          So the time -- it's incredulous that they want us to

3   engage in this process today when the time to engage in that

4   process under Zolin and its progeny was three years ago before

5   they read, digested, analyzed all of these documents and used

6   them to prosecute this case.

7          So that step was rendered moot by plaintiff's conduct

8   three years ago.  So there's no reason for the Court to engage

9   in an in-camera review today.

10          Although, your Honor's correct that obviously the

11   documents are before them in a different capacity.  Albeit,

12   they have been stricken with the exception of the 200-ish

13   documents that were never disclosed to defendant in this case.

14   So they've already been stricken.  The attorney/client

15   privilege, it's -- they're privileged on their face.  They've

16   been stricken.  They've been sealed.

17          And so even if the Court engaged in this Zolin process

18   to afford plaintiff the relief, which really is forgiveness,

19   Judge, they should have been asking permission three years ago.

20   Today they're asking for forgiveness.  So they want the Court

21   to engage in a process that plaintiff rendered moot by her own

22   conduct and her counsel's conduct.

23          But even if the Court were to consider that process,

24   plaintiff can't make the showing under Zolin that an in-camera

25   review would be required in the first instance because there

────── TRANSCRIBED FROM DIGITAL RECORDING ──────

1    has to be some evidence besides the privileged material to make

2    a good faith showing by a preponderance of the evidence that

3    there's a reasonable belief that the privileged material is

4    going to show evidence of the crime fraud exception.

5           So even if the matter were properly before the Court,

6    plaintiff doesn't have any evidence other than the privileged

7    material which plaintiff cites for pages in opposition to the

8    motion for sanctions and in the -- I believe the reply and

9    their motion for in-camera review.  Their sole documents, which

10   they say demonstrate evidence of crime or a fraud, that Rick

11   Wright committed a fraud or that Mr. Ronaldo's other attorneys

12   committed some sort of fraud, the sole evidence they rely on is

13   the privileged attorney/client communications.  And they cite

14   it to the Court for pages.  That's not ever going to meet the

15   standard under Zolin.  So the process was rendered moot three

16   years ago.

17          And number two, even if they had done it correctly,

18   they wouldn't have any evidence to put forth to the Court other

19   than a settlement agreement and under the -- and the master

20   case.  Evidence that a case was settled and resolved and

21   someone limited their liability by resolving a case is not

22   evidence of a crime or any kind of fraud on the Court.

23          So they could never have made that showing before and

24   they certainly can't make it today when they've already

25   rendered the issue moot.

─── TRANSCRIBED FROM DIGITAL RECORDING ───

1          So we would ask that the Court deny the motion, your

2   Honor.

3          THE COURT:  All right.  I am going to take that under

4   advisement --

5          MR. STOVALL:  Thank you.

6          THE COURT:  -- and include it in my ruling with 111

7   out of an abundance of caution.

8          I'm inclined to think that they did render it moot

9   given their actions, but I don't know that I'm inclined or

10  ready to make that decision here today and so I will consider

11  it in the context of the arguments we're about to hear on the

12  last motion and that will just be included probably in an

13  omnibus order or report recommendation to Judge Dorsey,

14  whichever way it's going to go.

15         But I think, given the nature of this case, what has

16  happened in the past and what will probably happen in the

17  future with my rulings and everything else, out of an abundance

18  of caution, it's probably better to have it all in a written

19  order.

20         So I will rethink what I said at the beginning and

21  will not rule on that one today.  I'll take that one under

22  advisement, as well.

23         So Mr. Stovall, is there everything else you want on

24  that before I hear from the parties on the motion for

25  sanctions?

TRANSCRIBED FROM DIGITAL RECORDING

1      MR. STOVALL:  Thank you very much.  Just very briefly.
2  I would like to comment on the question of waiver.
3      When you look at the Zolin cases, waiver isn't found
4  in those decisions, the cases I've read.  I may not have caught
5  them all, may have missed that, but the posture in this case is
6  either those documents are presumptively privileged --
7  presumptively privileged is a word of art within the Zolin case
8  law.  It identifies documents where a party is asserting the
9  attorney/client privilege in which the other party is saying,
10  "Wait a minute, the privilege doesn't apply because of Zolin."
11      I would ask the Court to keep in mind the distinction
12  between the Jackson and Xyngular -- I think that's how you
13  pronounce -- Xyngular Swanker [sic] case and the Zolin cases.
14  They don't overlap.  Those cases do not discuss and do not
15  refer to the crime fraud exception.  And in fact, my
16  impression, when I look at the -- these lines of cases, the
17  Court isn't concerned about Jackson and Swanker when there is a
18  crime fraud exception consideration.
19      And that goes to the language of Zolin.  In Zolin, the
20  Court talked about -- and called it an aggressive investigation
21  or discovery.  It was one of the considerations that the
22  Supreme Court made in adopting the standard it did which is a
23  much lower standard than positive proof of crime fraud in
24  step -- doing the Step 1 analysis and then looking at the
25  documents.  So I would just ask the Court to keep in mind that

TRANSCRIBED FROM DIGITAL RECORDING

1    I haven't seen case law where you can waive consideration of

2    the crime fraud exception.

3          And furthermore, this plaintiff -- this defendant has

4    continuously asserted the crime -- I mean the attorney/client

5    privilege and its application to these documents.

6          So thank you.

7          THE COURT:  All right.  Well, then let's address the

8    main reason we're here.

9          And so let me ask you, Ms. Works, and perhaps I should

10   have considered this earlier and didn't necessarily consider

11   it, and that is whether this is something that should be

12   determined by the arbitrator or our court.  Why our court?

13         MS. WORKS:  Your Honor, it should be determined by

14   this court because plaintiff's conduct -- plaintiff put

15   (unintelligible) before this Court and its (unintelligible)

16   under counsel's conduct that has tainted the entirety of the

17   proceedings.

18         And so the Court should -- this Court should determine

19   whether or not to dismiss the case based on case terminating

20   sanctions or disqualify Mr. Stovall and his law firm from

21   continuing their representation because we can obviate the need

22   to go to arbitration at the outset and further litigate this

23   case because plaintiff isn't entitled to litigate the case

24   because they based it on intentionally obtaining stolen and

25   privileged attorney/client communications.  The case shouldn't

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1   exist in the first place.

2         This is an attempt to obtain stolen documents in order

3   to unwind a settlement from a decade earlier in the height of

4   the "Me Too" movement to obtain additional money despite having

5   retained the full settlement funds, despite having complied

6   with the settlement, both sides, for more than a decade until,

7   for the first time, Ms. Mayorga's name is -- she is identified

8   by name in the press, not by Mr. Ronaldo, but after she sits

9   with her lawyer for an interview with a German publication and

10   her name is then disclosed days after the original complaint

11   was filed in state court.

12         So here, we have an attempt to unwind the deal by

13   obtaining stolen, privileged documents, basing their entire

14   case on those documents, prosecuting the case on those

15   documents, but not disclosing to defense that they have those

16   for more than 14 months after obtaining them.

17         And so the matter is before the Court because

18   plaintiff's conduct and that of her counsel has been before

19   this Court.  And so this Court has inherit authority to dismiss

20   an action and to impose dismissal as a sanction for violating

21   the integrity of the judicial process and intentional

22   misconduct.  And that's exactly what the Court has here.

23         THE COURT:  Okay.  Let me ask -- while I'm in the

24   "asking question" mode -- what do you have or why is it that

25   you believe that plaintiff's counsel provided Metro with more

————— TRANSCRIBED FROM DIGITAL RECORDING —————

1  than what they provided you?

2          MS. WORKS:  Sure.  So a quick review and if -- I think

3  if we go to our reply brief, your Honor, we list out at least

4  60 identifying documents by Bates number that were contained

5  within Metro's file but were not contained within Exhibits 4

6  and 5 to plaintiff's opposition to defendant's motion to compel

7  arbitration.  And that's just a sampling, your Honor.  So

8  there's about 400 more documents total in Metro's file, what

9  Metro produces, there are 400 more Football Leaks documents.

10          And admittedly, you know, plaintiff argued that

11  they're just different formats, they just look different.  And

12  there are some that are the same content, your Honor, but --

13  and formatted differently, but there's additional documents

14  that the content is not contained in Exhibits 4 and 5 which

15  plaintiff actually produced.

16          Now, plaintiff never produced the full Metro file.

17  Defendant went and subpoenaed it.  Albeit, plaintiff provided

18  an authorization which would have been required by the Court

19  anyway.

20          So what we have in there -- and we've identified it

21  and I'll provide the Court with the citation.  In our reply

22  brief, there's a -- Footnote 5 on page 6, and that's just a

23  sampling, your Honor, to be honest.  We didn't go through every

24  single document, 400 pages, line by line, but what we were able

25  to do is OCR both Exhibits 4 and 5 and the Metro file and

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1  search for key terms.

2        And there are key terms that appear on all of these

3  documents in the Metro file that simply are not contained in

4  Exhibits 4 and 5.  And so those documents were never disclosed

5  to plaintiff.  So not only do you have them intentionally

6  obtaining them in the first place, keeping them for 14 months,

7  but you also have additional documents that they provided to

8  Metro, admittedly asking Metro to prosecute based on

9  attorney/client privileged documents that they then don't

10  disclose at all to plaintiff -- or to defendant.

11        THE COURT:  Could Metro have -- could Metro not have

12  obtained those documents from other sources, other --

13        MS. WORKS:  Well, they would have -- in theory, they

14  could have, but there's two cover letters -- and still, it

15  would be questionable whether they would be able to obtain

16  attorney/client privilege.  Then you may (unintelligible) on a

17  Zolin issue which is to say, should they be able to have those

18  attorney/client privilege, is there evidence of some sort of

19  crime or fraud.

20        Because, remember, all of these documents, your Honor,

21  are after the fact.  They're after the sexual assault.

22  Mr. Ronaldo goes and obtains a lawyer in order to defend

23  himself again plaintiff's accusations once she decided to

24  pursue civilly, not criminally.  But the reality here is

25  there's two cover letters from Mr. Stovall in Metro's file in

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  which he says, "I'm providing you all of these documents from

2  Football Leaks," and they show evidence of some sort of crimes,

3  some sort of fraud.  Notably, of course, Metro never filed any

4  action against Mr. Wright or any of Mr. Ronaldo's other lawyers

5  and doesn't file any action against Mr. Ronaldo.

6       THE COURT:  So -- and I think that's the rub-in.  So

7  we're all on the same page as to what crimes we're talking

8  about, I don't think the plaintiff is talking about the crime

9  being the sexual assault.  I think they're talking about some

10 sort of either obstruction of justice or misprison of a felony

11 since my criminal days of trying to get something other than a

12 felony.  But something other than just by the lawyers doing

13 this is what they're alleging that they were trying to cover up

14 or try to not -- or try to prevent the prosecution, as it were,

15 of the defendant.  And that's what the crime is, the lawyers

16 doing that.

17      And so you don't believe then or there isn't any

18 indication to you that Metro was doing a concurrent

19 investigation or a similar investigation and might have

20 obtained these documents?

21      MS. WORKS:  There's no indication in Metro's file,

22 your Honor.

23      And even in an opposition to our motion, plaintiff

24 can't -- has never expressly said, "We didn't provide Metro

25 with those documents.  Those weren't documents we never

TRANSCRIBED FROM DIGITAL RECORDING

1    obtained.  We never had possession of those documents."

2         And so -- and there's also no indication -- it's

3    notably absent from Metro's file all together.  There's a

4    listing of where they obtained certain things and were provided

5    certain documents and never once do they say, "Well, we went

6    and subpoenaed Football Leaks because we wanted to investigate

7    the lawyer's conduct or we're considering additional charges,"

8    anything like that.

9         THE COURT:  And out of curiosity -- and I don't know

10   how this plays in, but the law at the time that this occurred,

11   was there a statute of limitations on this criminally, on the

12   sexual assault at the time, or does this fall under the new

13   laws that have been passed here recently where this is no

14   statute of limitations?

15        MS. WORKS:  Your Honor, it would have fallen under the

16   earlier law which provided at that time that if a victim of

17   sexual assault had reported the allegation, then the statute of

18   limitations would be tolled essentially or would not apply.

19        But because plaintiff never identified Mr. Ronaldo to

20   Metro, to law enforcement, there's a very strong argument,

21   which I don't believe Metro or the DA's office ever arrived at

22   because they simply determined that it was not warranted to

23   prosecute, but there would have been a very strong argument for

24   the statute of limitations would have applied because she never

25   identified Mr. Ronaldo by name.  And so technically, that's not

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1   a report that would satisfy the (unintelligible) statute.

2           THE COURT:  And it's your position that plaintiff

3   submitted those to Metro to gain leverage in the case, to gain

4   leverage in the negotiations, and of course that -- your

5   position is that's improper use of those documents and didn't

6   turn those over to you so you didn't know what was happening.

7   Just make sure I understand where you guys are coming from.

8           MS. WORKS:  Absolutely, your Honor.  It was improper

9   to obtain the documents outside of the judicial process.  It

10  undermines the integrity of this entire case.  It -- certainly,

11  it's improper to obtain attorney/client privilege documents

12  intentionally.

13          And that's what Mr. Stovall's cover letter on behalf

14  of plaintiff to Football Leaks says exactly that.  It

15  specifically requests attorney/client communications and work

16  product.  He's asking for those things.  And it begs the

17  question of, you know, there could be some argument that he's

18  made that, "Well, it was already in the public eye.  It was

19  leaked already."

20          Well, if that was the case, then why didn't

21  Mr. Stovall just go get the leaked documents from the internet?

22  No.  He went a step further and intentionally sought out from

23  Football Leaks every thing that they had, the entire universe

24  of attorney/client communications.

25          THE COURT:  This is that e-mail or document that was

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1    sent that has, like, 12 things that he requested and some of

2    that, you know, talks about the negotiations leading up to the

3    mediation, a report and communications of the attorneys --

4            MS. WORKS:  Investigators.

5            THE COURT:  Correct.  Correct.

6            MS. WORKS:  So (unintelligible) you have a licensed

7    attorney knowingly seeking out attorney/client privileged

8    communications and work product, expressly asking for those

9    things, obtains those things, and then goes to law enforcement

10   and says, "Hey, here you go, prosecute this decades-old crime.

11   And by the way, I'm going to go file a lawsuit too to try to

12   get my client more money using all of the lawyers'

13   attorney/client privileged communications and work product."

14           And, your Honor, if it's on balance of evidence, we

15   have provided declarations from Mr. Wright, from Mr. Osorio

16   DeCastro, and then also from Ms. Janeen Isaacson, former state

17   bar counsel, documenting that, in fact, she's reviewed these

18   documents.  She's reviewed Mr. Stovall's correspondence and his

19   use of those documents throughout these proceedings and that

20   it's absolutely a violation of his ethical cannons, that it's

21   absolutely attorney/client privilege which should not have been

22   intentionally sought out or used in this litigation.

23           And so on balance of the evidence, the Court is

24   looking at, well, who has presented evidence of crime fraud or

25   should there be an in-camera review.  Plaintiff, who has the

TRANSCRIBED FROM DIGITAL RECORDING

1  burden to demonstrate that there's a reasonable likelihood of

2  showing crime fraud, has not provided the Court with any

3  evidence other than a self-serving affidavit of counsel to say,

4  "Well, I went and got these documents, your Honor, but it's

5  justified.  So now rubber stamp my misconduct from three years

6  ago and look at all these documents and provide that the crime

7  fraud applies."

8           That's not where we are in these proceedings.  If they

9  wanted to obtain these documents, there would have been a

10 vehicle by which to do that within the litigation.  But that's

11 not what happened.  And that's what has undermined the entire

12 integrity of these proceedings.

13          THE COURT:  Thank you.

14          So Mr. Stovall, when you -- you know, you look at your

15 contact with this John and what it is you're requesting, you

16 know, at first blush, it looks like, you know, perhaps you -- I

17 mean, if these were out in the public anyway, then you would

18 have had that avenue to get them and they clearly wouldn't have

19 been attorney/client privilege, but you went apparently

20 directly to this guy who sent them directly to you.  It has a

21 bad look.

22          MR. STOVALL:  All right.  The Court -- the context of

23 the request was this.  This was in, I believe, 2019 if I recall

24 the correspondence.

25          THE COURT:  2018.

TRANSCRIBED FROM DIGITAL RECORDING

1          MR. STOVALL:  2018.

2          The Football Leak documents had been obtained prior to

3     2018 and were published.  They were delivered over to Der

4     Spiegel and to a group of newspapers or news organizations in

5     Europe called EIC.  Those entities had been publishing articles

6     about corruption within the European Football Federation, the

7     teams and the managers and things.  And in fact, those

8     publications ultimately led to criminal charges, primarily tax

9     fraud, being brought against a number of football players

10    including Ronaldo and -- which he pled in 2018 to tax fraud

11    under Spanish Law.

12          Those documents, the specific documents were not in

13    the public as far as I know in any depository.  In fact, I went

14    to Der Spiegel and I also went to the -- and asked them for

15    those documents and they would not release them.  I had

16    asked -- I tried to get a hold of former counsel for the

17    plaintiff, the lawyer that was involved -- that's Michaela

18    Woods -- and she refused to give me any documents out of her

19    file.

20          What was clear in the publications that had been made

21    throughout Europe prior to 2018 was that there was -- it

22    appeared, to me, to be a conspiracy to prevent or interfere

23    with the prosecution of Ronaldo for the rape of Mayorga.

24          Now, none of this would have come up if there hadn't

25    been the April 2017 publication by Der Spiegel of the rape and

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1    the settlement.  And that article sufficiently identified

2    Ms. Mayorga, didn't name her, but people knew who it was and

3    she had been contacted by a number of news organizations and

4    also friends and other people about that incident.

5              I was unable to obtain any documents and so I sent out

6    an inquiry to John at Football Leaks and I received two

7    responses.  I've been very upfront about this throughout the --

8    this case.  It's -- if you look at the complaint that was filed

9    in the Clark County District Court, I outlined exactly what I

10   did, and if you look at the complaint in this court, I outlined

11   exactly what I did and what I obtained and what I did with

12   those documents.

13             I received two sets of documents from John at Football

14   Leaks.  John at Football Leaks -- the first set of documents, I

15   turned over to Metropolitan Police Department in August of 2019

16   and I requested that the Metropolitan Police Department do two

17   things:  One, investigate -- reopen the investigation on the

18   rape, and two, to investigate compounding and fraud.

19             When I received the September correspondence or

20   documents from John at Football Leaks, I turned those over to

21   Metro also and -- with a renewed request that they investigate

22   and reopen their investigation of Ronaldo for the rape and also

23   of the other people that participated in the compound.

24             THE COURT:  Did you turn over everything that you

25   turned over to Metro to defense counsel?

──── TRANSCRIBED FROM DIGITAL RECORDING ────

1          MR. STOVALL:  I did.  I absolutely did.

2          And this idea that I held back 400 pages of documents,

3   I have -- and I put it in my affidavit to the Court or my

4   declaration to the Court, I don't know where those came from.

5   I hadn't seen them before.  No idea.

6          And I have admitted that the documents, which is the

7   August -- (unintelligible) August cover letter and then the

8   September cover letter are the same documents that I disclosed

9   in disclosures here in this Court.  I did it under Rule 26 as

10  initial disclosures.  And those are the same documents I

11  exhibited to the Court in opposition to their motion to compel

12  arbitration.

13         So those are the only documents I got.  I don't know

14  where this other stuff came from for Metro.  I did not have the

15  Metro file.  There was an ongoing investigation.  They wouldn't

16  have given it to me even I had asked for it.  I had no idea

17  what's in the Metro file.

18         I know that Ms. Mayorga had been interviewed and a

19  number of witnesses and people who witnessed the -- who were

20  around that incident were interviewed by Metropolitan Police

21  Department.  I had no access to that information.  And I don't

22  believe -- well -- and I never asked for it, quite frankly.

23         Metro, by the way -- defense stood up here and said

24  Metro did nothing with it or decided not to prosecute.  I don't

25  think that's accurate.  And you have in the record of this case

—TRANSCRIBED FROM DIGITAL RECORDING—

1   an affidavit requesting the issuance of an arrest warrant

2   signed by the investigating officer of Metropolitan Police

3   Department seeking a warrant to arrest the defendant, Cristiano

4   Ronaldo, for sexual assault.

5           What happened is when that was submitted to the

6   district attorney's office, Mr. Wolfson declined to prosecute.

7   He doesn't say why he decided to decline and anything -- any

8   argument is just speculation.  It was within the statute of

9   limitations.  The police believed that they had a case to

10  prosecute for one count of sexual assault and the DA decided

11  not to.

12          But whatever else -- whatever information they had,

13  whatever information they relied upon, you can read the

14  affidavit -- it's in the record of this case.  It's -- by the

15  way, it's a very comprehensive statement of what the

16  Metropolitan Police Department believed occurred.

17          And the basis for the requests --

18          THE COURT:  We're getting far field now from where we

19  started on this discussion.

20          So you're telling me that what you gave to Metro was

21  about a couple hundred pages of documents that you received

22  from the Football Leaks request for information?

23          MR. STOVALL:  Correct.

24          THE COURT:  And you don't know -- to the extent they

25  had another couple hundred pages, you have no idea where that

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1    came from but it wasn't provided by you or anybody from your

2    office?

3              MR. STOVALL:  I reviewed that 400 pages.  I don't

4    recognize those documents.  They appeared to me to be the

5    documents I submitted, but they were reformatted.  That's what

6    it appeared to me.  So I have no idea where they came from.

7              I do know that my office had sent the -- I believe

8    what have -- one of the things that happened was that my office

9    forwarded the e-mail from John at Football Leaks and perhaps

10   what they did was reprint that and it came out in a different

11   format than what was printed by my office, but I have no way of

12   knowing where those documents came from and defense hasn't

13   been -- there's no -- defense hasn't told you where they came

14   from.  They're simply saying it must have come from me.

15             Well, no.  I've denied that.  I've been very clear

16   with this Court as to what I submitted.  And I had Bates --

17   originally when I submitted those documents to Metro, I Bates'd

18   them.  You'll find my original Bates-stamp on those documents

19   right behind that letter including the e-mails between myself

20   and John at Football Leaks.

21             THE COURT:  Well, on that note, would you agree -- I

22   mean, aren't you asking for attorney/client information from

23   John?

24             MR. STOVALL:  Well --

25             THE COURT:  I mean, when I look at this, I mean, there

TRANSCRIBED FROM DIGITAL RECORDING

1  seems -- it seems to be rife with attorney/client information.

2       MR. STOVALL:  Sure.  I did.

3       And the reason I asked for that is because in the

4  agreement, if you look at the settlement and confidentiality

5  agreement, the individual that was vested with maintaining

6  those documents as confidential were Ronaldo's attorneys.  And

7  what I wanted to know was, is there any evidence or anything

8  that would suggest how those documents were released or came to

9  be obtained by third parties.

10      Now, this is a case where if you look at Jackson and

11 the Schwanker [sic] case, that's the Xyngular versus Schwanker

12 case, every one of these cases where you see that there's been

13 sanctions, terminal sanctions or disqualify -- a

14 disqualification of a party or counsel, it's where the party

15 who obtained participated in the acquisition of those

16 documents.

17      That is not what happened here.  I have no idea where

18 these documents came from.  I have asked --

19      THE COURT:  So when you contacted John, you didn't

20 know that these documents were obtained from a hack, from the

21 lawyer's computers?

22      MR. STOVALL:  No.

23      THE COURT:  How else -- how else would you get such --

24      MR. STOVALL:  Well, I don't know.

25      THE COURT:  I mean, put yourself -- you've been a

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1  lawyer for a long, long time.  I mean, think about the --

2          MR. STOVALL:  I don't want to play games with you.

3          It was -- when I looked at these documents, it

4  appeared that these were e-mail documents between parties.

5  Okay?  When I asked for all correspondence and all

6  communications, I didn't know if it was going to come from the

7  computer or from some other source.  But I did request that.

8  It's in my writing.  I'm not denying that -- what I requested

9  as what's in that e-mail.

10          My point to the Court, though, is this:  I didn't

11 participate in obtaining those documents.  Those documents were

12 acquired two, three years before my request went to John.  And

13 there is no evidence in this case, and I don't think there is

14 anywhere else unless you accept the newspaper reporting, that

15 John is the hacker.  He denies it.  And all the reports.

16          THE COURT:  But does any of that matter?

17          MR. STOVALL:  Yes, it does.

18          THE COURT:  Why?  I mean, as an officer of the Court

19 and, you know, a practicing lawyer governed by the Rules of

20 Ethics and all those rules that govern lawyers' behavior, just

21 because you didn't do the hack and just because they had been

22 out there for -- they're still nonetheless attorney/client

23 material that you're using to forward -- so whether you did the

24 hack or anything else, you reached out to someone who had them.

25          MR. STOVALL:  Well, within the context of this case,

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

 1   it's not only is this information -- there is -- so the

 2   questions that haven't been answered that I think are

 3   absolutely essential for the Court to make the decision in this

 4   case on terminal sanctions or in the requests for

 5   disqualification is:  How did these documents get into the

 6   public?  Were they really hacked?  When did that occur?  How --

 7   to what extent does anyone know how it occurred and where did

 8   they go?

 9          Now, they eventually ended up with John at Football

10   Leaks, and they were eventually published and --

11          THE COURT:  So you're saying at some stage, the time

12   and the exchange of the documents through people somehow

13   absolves them -- you and others who later on might use that?

14   It's all okay even though they're out there?

15          MR. STOVALL:  Yeah, I think there's a -- I think when

16   you really talk about how these documents came to -- into my

17   possession, that there's a real question of whether or not

18   there was a waiver of the attorney/client privilege if such a

19   privilege applies without consideration of the client -- crime

20   fraud exception.

21          THE COURT:  How did they waive it?

22          MR. STOVALL:  What?

23          THE COURT:  How did they waive the attorney/client

24   privilege?

25          MR. STOVALL:  Well, there's case law that says if you

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1  get stuff out there in the public and you don't go and try to
2  protect it --
3       THE COURT:  How can they protect it if they didn't
4  know it was out there?
5       MR. STOVALL:  They did know.  They knew in 2015 when
6  this stuff was being published in Europe.
7       THE COURT:  How did they know the publishing was based
8  upon attorney/client confidential information?
9       I mean, you just alluded to yourself, and I think we
10 can all agree, that the press and what's out there, we can't
11 necessarily always believe.
12      So I mean, is the attorney -- you know, an attorney
13 probably has to make a determination, "Look, this is a bunch of
14 BS.  We don't trust the press.  So do I really want to go raise
15 a stink" versus if they really know that the attorney's
16 computer system has been hacked and they've taken all the
17 attorney/client e-mails.
18      Did they -- you think they really knew that, that they
19 had done that, that they had taken it and they therefore waived
20 it?
21      MR. STOVALL:  No.  I think -- I think you're asking me
22 the -- pointing out the same issue that I'm pointing to you is
23 I don't know, but what I do know -- I don't know how it came or
24 who got it and what they thought of that information.
25      But the fact is we don't know how that information

TRANSCRIBED FROM DIGITAL RECORDING

1  came out of, let's say, Ronaldo's attorneys' computers.  We

2  don't know if Ronaldo's attorneys didn't release it

3  voluntarily.  We don't know if -- and that's the problem with

4  the affidavit from Mr. Ronaldo's lawyer, DeCastro, is he

5  doesn't even say where those documents came from.  He just

6  says, "Oh, I had good security."

7          Okay.  You had good security but what about those

8  documents?  Were they stolen?  He doesn't say that.  There is

9  nothing in this record that establishes these documents were,

10  in fact, stolen.

11          All we have are newspaper publications.  If you want

12  to rely on them, fine.  Because those newspaper publications

13  also tell you that John has denied hacking.  He said they came

14  from multiple sources.  And the point is, that if they came

15  from multiple sources, how can you say they were illegally

16  obtained.

17          And furthermore, they were published.  They were

18  published all over Europe.  There's a book written about these

19  documents.  One of the writers at Der Spiegel published a

20  series of books on the Football Leak documents.  And it was in

21  these documents, according to the press, because I tried to

22  talk to John -- his name's Rui -- Rui -- I can't remember his

23  last name, but he -- he was arrested in Hungary and extradited

24  over to Portugal and I tried to speak to him and his lawyer

25  wouldn't let me talk to him.

─ TRANSCRIBED FROM DIGITAL RECORDING ─

1          THE COURT:  Rui Pinto.

2          MR. STOVALL:  Yeah, that's correct.  Rui Pinto.

3          And Mr. Pinto's lawyers, I asked to be able to speak

4    to Mr. Pinto to authenticate these documents and explain to me

5    where they came from and they declined to allow me to do that.

6          THE COURT:  So what you're telling me then is -- so

7    there's a couple reasons.  There's the waiver.  There's the

8    crime fraud exception.

9          And is there anything else then that would undo the

10   attorney/client privilege that I'm missing that you're --

11         MR. STOVALL:  No.

12         THE COURT:  -- arguing?

13         MR. STOVALL:  No.  The cases, as I understand them,

14   that once this stuff starts going out, if the person asserting

15   the privilege, they have to take reasonable steps to stop it.

16   They have --

17         THE COURT:  So are you saying then that when you got

18   this, you looked and said -- you were thinking, "I'm going to

19   ask for these materials from John.  And when he sends them to

20   me and I look and it looks like attorney/client privilege, I,

21   Mr. Stovall, am looking at these things and saying, you know

22   what, this has been out in the public for three, four" --

23   whatever it's been -- "on any number of platforms.  So number

24   one, they waived it.  And then number two, I, Mr. Stovall, am

25   looking and analyzing this saying that it's a crime fraud

TRANSCRIBED FROM DIGITAL RECORDING

1   exception and so I can go and run with these."

2           Is that -- is that the process, the thought process

3   that was going on or?

4           MR. STOVALL:  Yes, it certainly was.

5           When I looked at these documents and looked at the

6   length of time they had been out in the public, the lack of

7   information about where they came from, the failure of the

8   defendant to do anything to preserve or protect those documents

9   after their publication over such a period of time and the fact

10  that he had pled guilty to tax fraud based upon the disclosure

11  of these documents in Europe, and when I looked at those

12  documents and it became clear to me that -- or it appeared to

13  me that these people were engaged in compounding a felony, I

14  didn't think the attorney/client privilege applied.  That was

15  my opinion and I acted upon it.

16          And I don't think that a lawyer should be sanctioned

17  or a plaintiff should be sanctioned if those factors are true.

18  Because otherwise, what you are doing is you're saying there is

19  no way to protect a plaintiff against a party with their

20  lawyers who engage in this type of conduct.  And I think that's

21  exactly what the Supreme Court was talking about in Zolin.

22  This sort of takes us back to the crime fraud.

23          But I really want to distinguish the crime fraud

24  exception from the waiver issue.

25          THE COURT:  And I guess I -- so in closing, I'd say,

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1   so you really think these lawyers back in 2010, 2009, 2010 were

2   conspiring to keep Mr. Ronaldo from being charged criminally

3   and they weren't just doing what lawyers do, that's

4   representing him and trying to get their client out of a sticky

5   situation by --

6          MR. STOVALL:  Absolutely.  I really do.

7          When I read the correspondence and their

8   communications and what -- and I've cited to it in my briefing

9   where they say, "We accomplished our goal which was to keep you

10  from being prosecuted and now you ought to pay us that $550,000

11  that we billed you," I don't know what's clearer.

12         And there's a lot of case law around the country that

13  that's really outside the bounds of legality.

14         THE COURT:  In the context of sending somebody a

15  letter or a missive or a communication saying, "You should pay

16  our fee because we did this, this, and, this," that doesn't put

17  that statement in a different context?

18         MR. STOVALL:  No.

19         THE COURT:  "We helped you to avoid criminal charges."

20  I mean, that could mean that we provided the district attorney

21  or we provided Metro with other ancillary information that they

22  would not have otherwise had, that if you had not retained us

23  we wouldn't have been able to provide to Metro.  That helped

24  you avoid criminal prosecution.

25         I mean, criminal defense attorneys do this all the

———TRANSCRIBED FROM DIGITAL RECORDING———

1  time when they're negotiating with Metro and with the DA's

2  office in the context of trying to get the best result for

3  their client.  That rises to the level of --

4          MR. STOVALL:  The defense lawyers that I know who are

5  negotiating with Metro and are dealing with a victim are very

6  careful in not discouraging the victim from participating in a

7  criminal investigation.

8          THE COURT:  So what do you have then that they had

9  that is the smoking gun, best piece of evidence that they tried

10  to dis-waiver from participating in the criminal investigation

11  besides a civil settlement?

12          MR. STOVALL:  Well, what is the evidence?  I've

13  summarized it in my briefing both back when I was opposing the

14  motion for arbitration and recently, but I'll summarize it for

15  you.

16          This --

17          THE COURT:  Humor me.

18          MR. STOVALL:  Pardon?

19          THE COURT:  Humor me.

20          MR. STOVALL:  I don't mind.  I don't mind.

21          They had done a background investigation and they knew

22  that this individual, that's Ms. Mayorga, had the belief that

23  she was very vulnerable to a very powerful individual and she

24  was frightened of publicity.

25          And if you look at the correspondence between the

————— TRANSCRIBED FROM DIGITAL RECORDING —————

1    lawyers involved in this, they worked that angle.  What they
2    did is they -- and you'll see it throughout the negotiations.
3    "Well, if you continue to talk to Metro, we're not going to
4    continue settlement and we are going to publically accuse you
5    of extortion, that you had consensual sex and that you're now
6    trying to extort money from this famous, well-known person."
7    And she was terrified of that.  And that continued to be
8    repeated and repeated and repeated throughout their
9    correspondence.  There was a threat.
10           And she complied.  She stopped talking to Metro.  And
11   you can look at the investigative report from Metro and you
12   will see she stopped speaking to them early on.  Why?  Because
13   she was threatened with public exposure and humiliation by
14   defendant's attorneys.  And it's documented in those e-mails.
15           And it continues to be --
16           THE COURT:  The e-mails -- what type of -- e-mails
17   between whom?
18           MR. STOVALL:  Well, those are the Football Leak
19   documents.  You know, your exhibits --
20           THE COURT:  The privileged documents.
21           MR. STOVALL:  -- that we have in the case.
22           THE COURT:  That gets back to the -- they're
23   documented in the privileged documents.
24           I mean, these aren't letters that they're sending to
25   her lawyers saying that if she continues --

———— TRANSCRIBED FROM DIGITAL RECORDING ————

1          MR. STOVALL:  These are communications to her lawyers

2    that are being confirmed in their e-mails between themselves.

3          THE COURT:  Well, that therein lies the rub.  It's all

4    the documents that are the e-mails between themselves.

5          MR. STOVALL:  Well, it does take us to the crime fraud

6    exception.  And I thought you were asking me what evidence is

7    there that --

8          THE COURT:  No, I --

9          MR. STOVALL:  -- there was actually compounding

10   occurring.

11         And if you -- if you read through those documents,

12   which I -- we've identified as Football Leak documents in this

13   case, which I saw and turned over to Metro, it is -- doesn't

14   take a lot of imagination to understand what these lawyers and

15   these -- by the way, lawyers involved in this stuff, this was

16   their business.  They protect reputations.  They're this group

17   out of California and another group out of England that this is

18   what they do.  And they knew what they were doing and they were

19   successful.

20         And by the way, not only did they get the agreement,

21   ultimately, when you look at what Metro -- how Metro handled

22   this thing, they were ultimately successful.  They delayed

23   prosecution, and when Metro reopened it and then decided that

24   they had a case and asked the DA to prosecute it, he deferred.

25         When you put all this together, it is a startling

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  case.  I can't think of -- to me, I can't think of a more

2  clearer case of an obstruction or a compounding of a crime by

3  lawyers and a party.

4          THE COURT:  And so at no time when you were exchanging

5  information with John did you ask him how he got these

6  documents, how they -- you didn't get into the specifics of

7  that?  You just --

8          MR. STOVALL:  I did not.

9          THE COURT:  Okay.  You just --

10         MR. STOVALL:  I did not.  I just simply --

11         THE COURT:  Whatever you --

12         MR. STOVALL:  You got my communications with him.

13         THE COURT:  Right.

14         MR. STOVALL:  Everything I did, I've given to the

15  Court.

16         THE COURT:  Right.

17         MR. STOVALL:  And again, I disclosed that, I

18  identified that stuff in the complaint filed in both of the

19  courts, the Clark County --

20         THE COURT:  Is there a reason why you delayed so long

21  turning it over to defense counsel?

22         MR. STOVALL:  Well, our first date for disclosure was

23  with the Rule 26 exchange here.

24         THE COURT:  All right.  So that was done.  That's why

25  the documents were finally turned over was the --

─────────── TRANSCRIBED FROM DIGITAL RECORDING ───────────

1      MR. STOVALL:  Absolutely.

2      THE COURT:  Okay.

3      MR. STOVALL:  Although, I will tell you, there's

4  correspondence in October of -- I'd have to find it.  There was

5  a letter that I sent to Mr. Christiansen.  Let me find it.

6      THE COURT:  Well, I think in September of 2019, he

7  sent you e-mails that the documents that you had were

8  privileged.  I think that's the first time as far as I can tell

9  from a --

10     MR. STOVALL:  No.  I sent him some correspondence

11  where --

12     MS. WORKS:  (Unintelligible) 2018.

13     THE COURT:  Right.  That's when in October 2018,

14  apparently Ronaldo's lawyers publically declared that they were

15  fabricated or altered, the Football Leaks documents, and then I

16  think you sent a letter or e-mail asking Mr. Christiansen to

17  identify --

18     MR. STOVALL:  That's correct.

19     THE COURT:  -- ones they believed were altered and so

20  the discussion was --

21     MR. STOVALL:  So -- so I point that out to the Court

22  for several reasons.  What is being said here publically by

23  Ronaldo and his lawyers is, "We know what the Football Leak

24  documents are.  And they're fake.  They're made up."  And this

25  is not true, what's going on -- what's being alleged.

TRANSCRIBED FROM DIGITAL RECORDING

1          And my response was, "Okay.  Tell me what's not true.
2   I'd like to know."  And that's based on their assertion that
3   they knew what those documents were.  Because that's what they
4   were saying publically.
5          And so it's a little surprising, I suppose, to have
6   them say, "Well, we just didn't know what was going on.  We had
7   no idea what these documents were.  Therefore, Mr. Stovall is
8   holding it back."
9          Well, within this litigation, it was under Rule 26
10  that the disclosure was made to the defense.  That's correct.
11          THE COURT:  All right.  All right.  Ms. Works?
12          MS. WORKS:  Yes, your Honor.
13          THE COURT:  There's a lot to address, but do your
14  best.
15          MS. WORKS:  Thank you.
16          So first, as to this waiver issue, the waiver of the
17  attorney/client privilege, first, I would point out that the
18  Court has already ruled on that issue, both your Honor and
19  Judge Dorsey, with respect to multiple arguments in response to
20  our motion to strike and seal the Football Leaks documents, the
21  original Exhibits 4 and 5.  The Court already found, after
22  extensive briefing both on the underlying motions and the
23  objections to your Honor's order, that Mr. Ronaldo and his
24  lawyers had not waived any attorney/client privilege and that
25  this situation was entirely distinctive and sufficient protocol

TRANSCRIBED FROM DIGITAL RECORDING

1    and precautions had been taken.

2            But second, if there was any doubt left, your Honor,

3    if the Court would look at Exhibits A and E to our reply brief

4    in support of the motion for case terminating sanctions, you

5    find declarations both from Mr. DeCastro and from Mr. Wright.

6    And in both of those declarations, they indicate that -- and

7    I'll quote here for the -- for your Honor from Mr. Wright's

8    declaration at paragraph 7, "Neither I nor Mr. Ronaldo ever

9    authorized or caused to be released any of the aforementioned

10   confidential and privileged attorney/client communications

11   and/or work product."

12           He goes on in paragraph 8, "Absent a binding court

13   order or expressed waiver from Mr. Ronaldo, I would never

14   authorize or cause to be released the confidential and

15   privileged attorney/client communications and work product

16   related to Ms. Mayorga's allegations against Mr. Ronaldo

17   because to do so would be a violation of my ethical duties as a

18   lawyer for Mr. Ronaldo."

19           So you have declarations from both of them and then

20   the earlier declaration from Mr. DeCastro about the safety

21   measures and protocols that were in place to safeguard

22   documents.

23           We also attached to our underlying motion, your Honor,

24   when the Football Leaks documents originally came out, what

25   happened is Mr. Ronaldo's attorneys in Europe were contacted

TRANSCRIBED FROM DIGITAL RECORDING

1   and asked for comment, not provided copies necessarily of what

2   was out there, but they did take an extra step at that point,

3   and Mr. DeCastro affirms in his affidavit that we've attached,

4   authentic translations of court documents filed in Germany and

5   Portugal in which Mr. Ronaldo's counsel sought to have any

6   further publication quelled and to prevent anybody from further

7   dissemination of any of the hacked documents.

8           So there's that issue that you have all of these --

9   that you have security measures in place.  You have both

10  evidence from both Mr. Ronaldo's local attorneys in 2009 and

11  2010 and his European lawyers saying, "We never authorized

12  disclosure of any of these documents.  In fact, we went and

13  tried to get a court order stopping any further publication

14  because the disclosure was never authorized."

15          But you'll also have Mr. Stovall conceding he couldn't

16  get these documents from anywhere else.  He conceded to

17  (unintelligible) his argument there, your Honor, that they were

18  not in the public eye, that even Der Spiegel refused to give

19  him all of these documents.

20          So he went straight to who he knew was the source and

21  specifically requested attorney/client privileged

22  communications and work product.  His e-mail could not be any

23  clearer.  He couldn't get the documents from anywhere else so

24  he went to the source, the Football Leaks hacker, and asked for

25  privileged attorney/client communications which he then relied

—————————— TRANSCRIBED FROM DIGITAL RECORDING ——————————

1    on in prosecuting this case.

2            And this idea that he wasn't required to disclose any

3    of these documents to defendant until the initial disclosure

4    deadline is patently false, your Honor.

5            If you look at the Isaacson affidavit and our ethical

6    cannons, you -- once you obtain, even innocently -- these

7    documents fell on his desk yesterday -- he has the obligation

8    to say, "Oh, these say attorney/client privilege all over them.

9    They say attorney-work product.  I have the obligation to then

10   promptly go to opposing counsel and say, 'Hey, these

11   attorney/client privilege documents landed on my desk.  I have

12   them.  And I'm turning them back over to you because I clearly

13   am not supposed to have them.'"

14           So even if he had innocently obtained these documents,

15   somebody miraculously dropped them on his desk, he would have

16   had an obligation at that point to go to Mr. Ronaldo's lawyers

17   and say, "Hey, I have these documents.  They're attorney/client

18   privilege.  I'm not supposed to have them."

19           As opposed to that, Mr. Stovall, on behalf of

20   plaintiff, goes out, intentionally obtains them, looks like a

21   lot like the Microsoft and Schenkel cases where you have

22   somebody who goes out and obtains the document.  And there the

23   plaintiffs didn't obtain them themselves either.  They did just

24   what plaintiff here did, obtained them from a third-party

25   source, then used, digested, analyzed the documents for months,

——————— TRANSCRIBED FROM DIGITAL RECORDING ———————

1   used them to prosecute their case, and then disclosed some --

2   in one case, they disclosed all the documents, and in another

3   case, the plaintiff didn't disclose everything.

4           Here, we have both a failure to disclose everything

5   but a failure to timely disclose in the first instance.  And

6   then using and digesting the documents.

7           And federal courts there found and the Ninth Circuit

8   affirmed in an unpublished decision in Microsoft that dismissal

9   was the appropriate sanction because you can't circumvent the

10  integrity of the judicial system by going out and intentionally

11  invading the attorney/client privilege and then using those

12  documents to prosecute your case.  You simply can't do it.  It

13  violates your ethical cannons.  It violates federal law.  And

14  it's exactly what happened here.

15          So he concedes they're not in the public light.  He

16  goes out and he obtains them.  There's been no waiver because

17  the only evidence in the record is that Mr. Ronaldo's attorneys

18  acted to quell the distribution.  Our office acted immediately

19  upon disclosure of the documents, sent a letter the following

20  day when we got them.

21          And the October 2018 letter to our office doesn't say,

22  your Honor, tellingly, "Hey, I have copies of all these

23  documents," or even at that point, "Hey, Mr. Christiansen,

24  here's all the documents I got.  Which ones do you say are

25  altered?"

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1          No.  They just say, "Which of the Football Leaks do

2    you contend were altered?"  We don't respond.  We don't have

3    the universe of that Football Leaks documents that he has.  We

4    don't know what he has.  We don't know he has all of the

5    attorney/client privileged communications.

6          And his complaint is very specific.  It's a protection

7    -- reputation protection specialist.  His team of fixers.  He

8    never says in the complaint -- plaintiff verified the state

9    court complaint and then in the federal court complaint.  It

10   never referred to having attorney/client communications.

11         So that's not disclosed until 14 months after he

12   obtained the records, the stolen privileged documents from

13   Football Leaks.  Fourteen months later, he discloses it, but by

14   then, the damage is done, your Honor.  He's already used it to

15   prosecute his case.  He hasn't disclosed the documents.

16         I mean, you can't extract that information from the

17   complaint, the briefings that followed, or Mr. Stovall's mind.

18   That's why disqualification alone is not sufficient.  Rather,

19   the remedy is dismissal.  Because we can't extract those from

20   the briefings from another lawyer to come in and take over the

21   case and not rely on that information.

22         And plaintiff herself relied on that information.

23   She's filled in the blanks with both Metro in her statement and

24   in her interview with Der Spiegel.  And so you can't --

25   plaintiff can't un-know that information either.  And there's

─────── TRANSCRIBED FROM DIGITAL RECORDING ───────

1   no safety precaution in place that this court or anybody else

2   could impose that would effectively preclude plaintiff or even

3   future counsel from being able to use that information, whether

4   intentionally or not.  She simply can't un-know it.

5           So we have no waiver.  The Court has absolutely the

6   discretion to impose dismissal as the sanction.

7           And then the crime fraud exception.  Everything he

8   argued to, your Honor, when the Court asked for evidence was

9   evidence contained within the privileged documents.  There is

10  no evidence of a fraud otherwise.

11          And I would contend to your Honor that even those

12  privileged documents don't show a fraud.  They show a lawyer

13  representing their client.  If saying, "Hey, we got you a

14  successful result and now we want you to pay our bill," is

15  fraud, your Honor, we're all in a lot of trouble.  It happens

16  in a number of cases every year.  Law firms across the country.

17  You do a good job, you want to get paid.  Sometimes you have to

18  point out that did you a good job in order to encourage your

19  client to pay your bill.

20          That -- even if the Court considers it, which it can't

21  because it's absolutely attorney/client communication that's

22  privileged, even if the Court could consider it, it's not

23  evidence of fraud, your Honor.  There's no evidence of fraud.

24          And the only evidence the Court can consider that's

25  not privileged is the settlement agreement.  And that's simply

—TRANSCRIBED FROM DIGITAL RECORDING—

1    an agreement to limit liability which both parties complied

2    with for more than a decade.

3              THE COURT:  So Mr. Stovall, I guess -- one question

4    for you.

5              Why -- when all of this stuff is labeled

6    attorney/client, why isn't that under the cannons something

7    that you would immediately provide to the attorney who's the

8    subject of the -- of the e-mails and the information?

9              I mean, isn't that something the cannons say that you

10   should be providing to that lawyer and say "Hey, look, I've

11   come into possession of this," or is this something that was a

12   part of your case and you were thinking "I'm not going to turn

13   over until I have to according to the rules"?  I mean --

14             MR. STOVALL:  Well, we have the Merits -- Merit

15   Incentive, LLC, Eighth Judicial District Court case here in

16   Nevada that says RPC 4.4 is satisfied with an NRCP 16.1

17   disclosure.  And that's what I did in this case.

18             THE COURT:  All right.

19             MR. STOVALL:  Now -- if I may?

20             THE COURT:  On what?

21             MR. STOVALL:  Well, I'd like to respond to her

22   statements.

23             THE COURT:  Well, it's their motion and you've had the

24   response and they've replied.

25             Is there something specific you think you need to

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1   address in their argument?

2           MR. STOVALL:   I do.

3           The defense, and I'm concerned the Court, have both

4   taken a position that the documents -- this Court has decided

5   that the Football Leak documents, those are the documents

6   within this case, are, in fact, attorney/client privilege.

7   They may well be.  The Court may decide they are, but the Court

8   has not made that decision to date.

9           And the Wella [phonetic] case, which I cited, speaks

10  about the burdens on the parties that are asserting the

11  attorney/client privilege and what the Court must do to

12  determine attorney/client privilege.

13          Effectively, what the defense has done here is they've

14  said -- asserted a blanket privilege.  There has been no

15  analysis made of the particular documents to determine whether

16  or not they are within the attorney/client privilege, not

17  withstanding the application of the crime fraud exception.

18  They've never asked for that and this Court has never

19  specifically said documents in this case -- they've stricken

20  them, but they haven't identified the documents that are

21  subject to the attorney/client privilege.

22          Secondly, the -- when you look at DeCastro and they

23  talk about the petitions that were filed in Europe, the German

24  and I believe it was Spain, those petitions were -- if I read

25  them correctly, they were denied.  The European courts did not,

—— TRANSCRIBED FROM DIGITAL RECORDING ——

1    as I read them, grant injunctive relief.

2           So furthermore, when I read them, it appears to me

3    that the courts in Europe felt that the defendant had not taken

4    appropriate steps to protect those documents on their

5    publication.  And I think the Court ought to look at those if

6    the Court is going to rely upon those documents to determine

7    that there was no waiver in this case by their failure to act.

8           The statement from counsel that the defendant never

9    waived or -- excuse me -- authorized disclosure of documents

10   doesn't answer the question.  The question really is:  How did

11   those documents get away from the defendant?  How did they get

12   away from the defendant?  And that hasn't been answered by the

13   defense.  And if anybody knows how those documents got away

14   from them, they would know.

15          There's nothing in this record that says they were

16   hacked.  There's nothing in this record that says they were

17   stolen.  It says, "We didn't authorize."  That doesn't mean

18   that they were not accessed or given up in some other way.

19   It's a very easy statement to say "We didn't authorize that,"

20   but that doesn't answer the question with regards to what did

21   they do to protect those documents, which under the agreement,

22   they had a fairly high standard for protection.

23          And by the way, that is also an element of the breach

24   of contract because when you look at that confidentiality

25   agreement, it was the documents were vested with the attorneys

—TRANSCRIBED FROM DIGITAL RECORDING—

1    and the attorneys had a fairly high standard to meet and they

2    didn't do it.

3           THE COURT:  Seems to me they weren't out there

4    anywhere but with this John guy and that's why you had to go to

5    John to get them, but I understand your argument.

6           MR. STOVALL:  All right.  Well, thank you, your Honor.

7           THE COURT:  All right.  Ms. Works, very, very briefly.

8           MS. WORKS:  Briefly, your Honor, for clarity of the

9    record.

10          I would just point the Court to paragraph 2 of

11   Mr. DeCastro's declaration which is Exhibit A to our reply

12   brief in support of case terminating sanctions.  He

13   specifically says, "Notwithstanding security measures taken to

14   protect confidential data in or around 2015 or 2016, outside

15   third-party hackers stole confident client data and information

16   including documents and information related to Kathryn

17   Mayorga's allegation that Mr. Ronaldo sexually assaulted her in

18   June 2009 in Las Vegas, Nevada."

19          He then goes on to outline the attempts to quell

20   publication of hacked documents in Europe and then further

21   indicates he's reviewed the documents in this litigation, the

22   Football Leaks documents eventually, albeit 14 months later,

23   produced by Mr. Stovall and affirms that neither he nor

24   Mr. Ronaldo -- and let's recall it's Mr. Ronaldo's privilege --

25   ever waived or authorized any sort of distribution or

—————— TRANSCRIBED FROM DIGITAL RECORDING ——————

1  dissemination of the information.

2           And the allegation that Ms. Mayorga was somehow afraid

3  of and bullied by the lawyers, which is all, by the way, based

4  according to Mr. Stovall on the privileged document, it still

5  remains a fallacy.

6           Even if the Court could consider those documents, the

7  reality is Ms. Mayorga stopped cooperating with the police --

8  and this is in the Metro file -- long before Mr. Ronaldo was

9  ever aware of these allegations.  He became aware because she

10  opted not to pursue the case criminally, contacted civil

11  counsel, and it was civil counsel and the correspondences

12  attached to pleadings here, the civil counsel who reached out

13  to Mr. Ronaldo's lawyers who he then obtained and retained

14  local counsel, Mr. Wright, here in order to defend against

15  Ms. Mayorga's allegations.  He was not contacted about the

16  criminal case at that point because he was never identified.

17  It was all based on the civil case, a civil case that back then

18  was resolved and today is based on stolen privileged documents.

19           THE COURT:  All right.  I certainly understand the

20  party's positions.

21           I will take 111, the defendant's motion for sanctions,

22  under advisement and I will also take 124, the plaintiff's

23  motion for in-camera view, because I think they're tied

24  sufficiently based upon the arguments of the parties, that I

25  will address both of those in a written order and/or report or

─────TRANSCRIBED FROM DIGITAL RECORDING─────

1    recommendation.

2          Mr. Stovall, anything else?

3          MR. STOVALL:  No.  No.  Thank you very much.

4          THE COURT:  All right.  Anything else from the

5    defense?

6          MS. WORKS:  No.  Thank you, your Honor.

7          THE COURT:  All right.  Thank you very much.  Enjoy

8    your weekend.  Court is in recess.

9          (Whereupon, the proceedings adjourned at 12:38 p.m.)

10                              * * *

11

12

13

14

15

16                    C E R T I F I C A T E

17

18      I, Samantha N. McNett, court-approved transcriber,

19   certify that the foregoing is a correct transcript transcribed

20   from the official electronic sound recording of the proceedings

21   in the above-entitled matter.

22

23      /s/ Samantha N. McNett          October 6, 2021
        Samantha N. McNett              Date
24

25