PETER S. CHRISTIANSEN, ESQ.
Nevada Bar No. 5254
pete@christiansenlaw.com
KENDELEE L. WORKS, ESQ.
Nevada Bar No. 9611
kworks@christiansenlaw.com
KEELY A. PERDUE, ESQ.
Nevada Bar No. 13931
keely@christiansenlaw.com
CHRISTIANSEN TRIAL LAWYERS
710 S. 7th Street
Las Vegas, Nevada 89101
Telephone:     (702) 240-7979
Facsimile:      (866) 412-6992
*Attorneys for Defendant Cristiano Ronaldo*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KATHRYN MAYORGA,<br><br>Plaintiff,<br><br>v.<br><br>CRISTIANO RONALDO,<br><br>Defendant. | CASE NO.:    2:19-cv-00168-JAD-DJA<br><br><br>**DEFENDANT'S MOTION FOR PROTECTIVE ORDER** |

Defendant Cristiano Ronaldo, pursuant to Fed. R. Civ. P. 26(c), hereby moves for a protective order barring the Las Vegas Metropolitan Police Department ("LVMPD") from producing its investigative file concerning the allegations in this case to the New York Times or any third parties and/or compelling return or destruction of all privileged and confidential documents. As set forth below, good cause exists to prohibit the disclosure of LVMPD's investigative file because it contains stolen documents and communications labeled attorney-client privilege and work product, which Plaintiff improperly obtained from an alleged cyber hacker from whom her counsel specifically sought privileged attorney-client communications and work product. Plaintiff then submitted the stolen documents to LVMPD in support of her request that LVMPD reopen a decade old investigation to prosecute Defendant. Defendant's interest in

1    maintaining the attorney-client privilege substantially outweighs any public right of access and,

2    thus, the subject documents should be protected.

3        Additionally, the allegations surrounding the entirety of LVMPD's investigative file are

4    subject to a confidentiality agreement precluding disclosure. The combination of the severity of

5    the allegations in this case, which could harm the reputations and personal privacy interests of

6    both Parties, warrants the implementation of protective measures by this Court.  The privacy

7    interests of the Parties are imminently threatened with substantial prejudice should LVMPD's

8    investigative file become public.  Further, allowing disclosure effectively eviscerates a material

9    purpose of the Parties' confidentiality agreement.  To avoid such outcomes, Defendant requests

10   that this Court enter a protective order prohibiting the disclosure of LVMPD's investigative file.

### DECLARATION OF KENDELEE L. WORKS, ESQ.
### IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

13       I, KENDELEE L. WORKS, ESQ., declare and state as follows:

14   1.    I am an attorney licensed to practice law in the State of Nevada and am counsel

15   for Defendant Cristiano Ronaldo. I am admitted to practice in the United States District Court,

16   District of Nevada.

17   2.    I make this declaration based on my own personal knowledge of the case and, if

18   called as a witness, could competently testify thereto.

19   3.    Pursuant to LR IA 1-3(f)/LR 26-6, I spoke with Counsel for LVMPD, Jacqueline

20   V. Nichols, Esq., telephonically on or about November 18, 2021, regarding the need to seek court

21   intervention as to the propriety of the New York Times' request for the investigative file at issue

22   in this litigation. Ms. Nichols agreed not to disclose LVMPD's investigative file pending the

23   Court's determination of the instant Motion.

24   4.    It is my understanding Plaintiff's counsel is aware of the New York Times' request

25   and has confirmed in writing Plaintiff's objection to the disclosure of any attorney-client

26   communications and work product until the District Court decides whether the documents are

27   privileged, presumably based on Plaintiff's Objection to the Magistrates' Order and Report and

28   Recommendation at ECF 143.

2

5.      I declare under penalty of perjury under the laws of the United States and the State of Nevada that the foregoing is true and correct.

Executed this 1st day of December, 2021.

_____
KENDELEE L. WORKS, ESQ.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    RELEVANT FACTS AND PROCEDURAL HISTORY

On November 18, 2021, Defense counsel received notice from counsel for LVMPD of a public records request LVMPD received from the New York Times for LVMPD's investigative files concerning Event No. 090613-1815, which involves LVMPD's investigation of Plaintiff's sexual assault allegations at issue in this case. *See* Letter, attached as **Exhibit A**. LVMPD has determined it will be providing the New York Times with "various reports, including the crime report and property reports; voluntary statements, Declaration of Warrant/Summons, and communications to and from LVMPD regarding the investigation" with "all personal identifying information of any victims" redacted on or about December 1, 2021. *Id*.

Defense counsel immediately responded, advising that Defendant would be filing a motion asking the Court to order that the file not be produced because it contains documents provided to LVMPD by Plaintiff's counsel, which are privileged, attorney-client communications and work product which opposing counsel should never have had in the first place. *See* Email, attached as **Exhibit B**. Plaintiff's counsel also informed LVMPD of his objection to the disclosure of any attorney-client communications and work product until the District Court decides whether the documents are privileged. *See* Letter, attached as **Exhibit C**.

### A. THE PARTIES MEDIATED AND AGREED TO CONFIDENTIALLY RESOLVE PLAINTIFF'S CLAIMS IN 2010.

This case arises from an encounter alleged to have occurred in 2009. Plaintiff Kathryn Mayorga ("Plaintiff") alleges Defendant Cristiano Ronaldo ("Defendant") sexually assaulted her at the Palms Casino on June 13, 2009.  Compl., ECF No. 1 at pp. 2-3.  Within months of the

1    alleged assault, Plaintiff retained counsel and sought civil redress for her claims.  *See* Declaration

2    of Defense Counsel, Kendelee L. Works, Esq., ECF No. 12.   Defendant, through counsel,

3    vehemently denied Plaintiff's version of events but agreed to privately mediate the dispute pre-

4    litigation.  *Id.*  The mediation took place in Las Vegas in January 2010 and at that time, the parties

5    reached an agreement as to confidentiality and a monetary settlement amount.   *Id.*   Over the

6    course of the following eight months, the parties further negotiated the final terms of the written

7    agreement, memorializing the resolution—the Settlement & Confidentiality Agreement ("SCA").

8    *Id.*  The SCA was fully executed by both parties and their Counsel in August 2010.[1]  ECF 30,

9    Exhibit A at p. 16.  Defendant paid the negotiated settlement amount and the matter resolved.

10            Within the SCA, both parties expressly denied the allegations of the other but agreed to

11   settle and a mutual release and further that all disputes arising out of the agreement shall be

12   submitted to binding ***confidential*** arbitration. *Id.* at ¶11.1.  Plaintiff and Defendant expressly and

13   mutually released each other and their various agents, heirs, representatives and families from

14   "any and all claims arising from or related to the Incident, related events and any other claims

15   against each other and any acts or conduct of any of the Parties [t]hereto which occurred at any

16   time from the beginning of time to the present."  *Id.* at ¶8.1.  The parties further agreed that:

17          [T]he exclusive manner of resolution of any and all future disputes or
            controversies of any kind or nature between them, however characterized,
18          including without limitation any claim for breach, non-performance, rescission,
            reformation, termination, declaratory relief, injunctive relief, or specific
19          performance of the [SCA], shall be through binding, confidential mandatory
            arbitration…
20

21   *Id.* at ¶11.1.  The arbitration provision was initialed by each party and both parties thereby

22   acknowledged they were waiving the constitutional right to a trial by judge or jury and the right

23   to appeal regarding claims which are subject to mandatory arbitration in accordance with the

24   SCA.  *Id.* at ¶11.1.  The terms of the SCA are to be governed, interpreted and enforced pursuant

25   to Nevada law.  *Id.* at ¶13.9.  Particularly relevant here, even in the event arbitration ensued and

26   one party sought judicial confirmation, that request was only to be made contemporaneous with

27   ───────────────

28   [1] A copy of the SCA was previously filed under seal as Exhibit A to Defendant's Motion to
     Dismiss (ECF No. 30).

a request that the proceedings be sealed to the "greatest extent permissible in order to maintain confidentiality…." *Id.* at ¶11.3.

As to confidentiality, the language of the SCA made clear that confidentiality of the allegations surrounding the Incident and the agreement itself was of utmost significance to Defendant and the purpose for which he was entering into the SCA:

> The Parties expressly acknowledge and agree that the Confidentiality provisions and the representations and warranties made by [Plaintiff] herein are a material inducement to the [Defendant's] entry into this Agreement, absent which they would not enter into this Agreement and would not agree to pay the monies hereunder to [Plaintiff].

*Id.* at ¶1.4.  In the event any of the confidential information pertaining to Plaintiff's claims about the Incident or her acts and conduct in response to the Incident were published, Defendant retained the right, "at their sole discretion or election, to respond publicly to any such media reports in a manner reasonably proportionate to the nature, substance and geographic scope of the previous media reports containing any Confidential Information." *Id.* at ¶ 10.2.  However, any response by Defendant [or one of his entities] did not eliminate or in any way modify the confidentiality and non-disclosure obligations of either Party.  *Id.*  The parties used pseudonyms as an additional preventative measure to ensure the confidentiality of their identities.  *See generally* ECF No. 30, Exhibit A; *see also* Confidential Side Letter Agreement, previously filed under seal as Exhibit B to ECF No. 30 (identifying the pseudonyms used for each party).

## B.  PLAINTIFF UNLAWFULLY OBTAINED PRIVILEGED AND CONFIDENTIAL DOCUMENTS.

In violation of the SCA, Plaintiff and her counsel requested and obtained stolen privileged and confidential documents from a cyber hack from Defendant's former attorney and circulated by the whistleblower outlet "Football Leaks." *See* ECF No. 143, on file herein. During the course of the instant litigation, Defendant learned Plaintiff obtained hundreds of additional confidential and privileged documents from Football Leaks, which she submitted to LVMPD as support for her request that LVMPD reopen a decade old investigation to prosecute Defendant but never disclosed in this litigation. Specifically, Defendant obtained a copy of LVMPD's investigative file on April 22, 2021. Although Plaintiff previously disclosed to Defendant the stricken Football

Leaks documents, also included within the LVMPD investigative file are approximately 400 additional documents, which Plaintiff has never disclosed in this litigation. *See* ECF 111 at 9:07-16. Of the approximately 400 additional documents, about half appear to be duplicates of attorney-client communications and work product that Plaintiff has disclosed but which appear in a different format. *Id.* Nevertheless, more than 200 documents appear to be stolen attorney-client communications and work product that Plaintiff's counsel obtained from Football Leaks and provided to LVMPD. *Id.*

Plaintiff has repeatedly attempted to use these documents to support her allegations in this case; such attempts are the subject of Defendant's pending Motion for Case Terminating Sanctions and to Disqualify Stovall & Associates before the District Court. *See* ECF 111. The Magistrate's Report and Recommendation properly concluded the District Court should grant Defendant's Motion and recommended that Plaintiff's case be dismissed with prejudice. ECF No. 143 ruling on ECF No. 111. Plaintiff's Objection to that Report and Recommendation remains pending. *See* ECF 153.

In accordance with the SCA and the Magistrate's Order for Confidentiality and Protective Order [ECF 101], Defendant designated LVMPD's investigative file as confidential and produced the entirety of the file in his Second Supplemental Disclosure of Documents to Plaintiff on April 30, 2021. Plaintiff failed to raise any objection to the confidentiality designation and, thus, LVMPD's investigative file remains subject to a protective order in this litigation.

## II.   **LEGAL ARGUMENT**

### A. **GOVERNING STANDARDS.**

Fed. R. Civ. P. 26(c) provides, in pertinent part, that a party "from whom discovery is sought may move for a protective order in the court where the action is pending . . ." and that the court may, for good cause, issue such an order by specifying the terms on which the discovery will be had, limiting disclosure, and/or requiring that confidential information be revealed only

in a specified way. *See* Fed. R. Civ. Proc. 26(c).[2] For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted. *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002). If the court finds particularized harm will result from disclosure of information to the public, then it balances the public and private interests to decide whether a protective order is necessary. *Id.*

The court has wide discretion in determining when a protective order is appropriate and what degree of protection is required. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (finding courts have broad discretion to determine what type of safeguards are required by a protective order). The law gives courts "broad latitude to grant protective orders to prevent disclosure of materials for many types of information, including, *but not limited to*, trade secrets or other confidential research, development, or commercial information." *Phillips*, 307 F.3d at 1211 (emphasis in original). The court has the authority to issue any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden. *Id.*

As the Ninth Circuit in *Phillips* recognized, courts have consistently granted protective orders that prevent disclosure of many types of information, such as letters protected under attorney-client privilege which revealed weaknesses in a party's position and was inadvertently sent to the opposing side, *see KL Group v. Case, Kay, and Lynch*, 829 F.2d 909, 917–19 (9th Cir. 1987); medical and psychiatric records confidential under state law, *see Pearson v. Miller*, 211 F.3d 57, 62–64 (3d Cir. 200); and federal and grand jury secrecy provisions, *see Krause v. Rhodes*, 671 F.2d 212, 216 (6th Cir. 1982). *Phillips*, 307 F.3d at 1212. "Most significantly, courts have

---

[2] Defendant recognizes he is not the party from whom discovery is being sought; however, both Parties and the Court have an interest in maintaining the confidentiality of the documents at issue, particularly given the Magistrates' recommendation that the entire case be dismissed. As the Court aptly noted, "[Stovall's] claim that the Football Leaks documents are 'fair game' even after the Court struck certain of them is downright abusive. Stovall has acted in bad faith to his client's––and the profession's—detriment." ECF 143 at 19:08-10. "[I]f the Court does not grant case-terminating sanctions, Stovall's actions could have far-reaching, dangerous consequences on the legitimacy of the judicial process." *Id.* at 22:05-06.

CHRISTIANSEN

— TRIAL LAWYERS —

granted protective orders to protect confidential settlement agreements." *Id*. (internal citations omitted).

**B. GOOD CAUSE EXISTS TO ENTER A PROTECTIVE ORDER PROHIBITING THE DISCLOSURE OF LVMPD'S INVESTIGATIVE FILE.**

1. *LVMPD's File Contains Stolen Documents and Communications Labeled Attorney-Client Privilege and Work Product.*

Good cause exists to enter a protective order prohibiting the disclosure of LVMPD's investigative file because it contains hundreds of pages labeled as privileged attorney-client communications and/or work product, which Plaintiff's counsel improperly sought and received from "Football Leaks" and then used as exhibits to public filings in this case. The Court ordered such documents be sealed and stricken from the record. *See* ECF Nos. 47, 67, and 72; *see also* Transcript of Proceedings dated September 17, 2021 at 12:04-17, on file herein. After Plaintiff's counsel continued to assert his intention to use information contained in the wrongfully obtained communications in order to prosecute Plaintiff's claims, the Court recommended that Plaintiff's case be dismissed with prejudice. ECF No. 143.

Preservation of the attorney-client and work product privileges is a cornerstone of American jurisprudence. Allowing the disclosure of such documents would undoubtedly transcend the documents into a vehicle for an improper purpose—that is, evisceration of the protections of the attorney-client privilege and work product doctrine. Nevada law also supports the sealing of records containing privileged attorney-client communications in the absence of any waiver of the privilege. *See Howard v. State*, 128 Nev. 736, 746 (2012).

Further, although the subject documents were cyber-hacked and leaked as part of the "Football Leaks" scandal and portions have been the subject of news publications, this third-party disclosure of privileged and confidential information does not render the information publicly known. The Ninth Circuit has held that, even after accurate confidential information has been disclosed in national newspapers, the subjects of the leaked confidential data retained their interests in preventing further disclosures. *See United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1174 (9th Cir.2010)(en banc)(holding that the court did not abuse its discretion in

concluding that "equitable considerations" required sequestration and the return of copies of illegally seized evidence, even though some professional baseball players' positive drug tests had already been reported in the New York Times and other newspapers)). Therefore, good cause exists to protect these documents and/or compel the return or destruction of the subject documents, as the public has no right to access privileged attorney-client communications and work product.

    2. <u>Protection is Necessary to Maintain the Parties' Private Interests in Confidentiality.</u>[3]

Good cause exists to enter a protective order prohibiting the disclosure of LVMPD's investigative file in order to preserve the SCA's confidentiality and obligations for which both parties bargained, as well as the serious personal privacy interests of the individuals involved. Courts have routinely granted protective order to protect confidential settlement agreements. *Phillips*, 307 F.3d at 1212. "Sound judicial policy fosters and protects this form of alternative dispute resolution . . . The secrecy of a settlement agreement and the contractual rights of the parties thereunder deserve court protection." *Kalinauskas v. Wong*, 151 F.R.D. 363, 365-67 (D. Nev. 1993).

Both Plaintiff and Defendant opted to resolve their dispute confidentially after a private mediation and without involvement of any court system. They further agreed that should a dispute arise regarding the SCA that it would be subject to binding confidential arbitration. No claims were filed against Defendant before the 2010 agreement was reached and, thus, the events alleged to have occurred in 2009 remained confidential and were never part of the public domain until

---

[3] It is unclear whether the New York Times' request for LVMPD's investigative file was made under the Nevada Public Records Act ("NRPA") or the Freedom of Information Act ("FOIA") because Defendant is not in possession of a copy of the request. However, in either case, the Court must consider the privacy interests of the individuals, balancing the personal privacy interest in non-disclosure against the public interest in access. *Clark Cty. School Dist. V. Las Vegas Review-Journal*, 134 Nev. 700, 707-08, 429 P.3d 313, 320-21 (2018)(adopting the two-part balancing test related to Exemption 6 concerning privacy interests set forth in FOIA); *Donrey of Nevada, Inc. v. Bradshaw*, 106 Nev. 630, 636, 798 P.2d 144, 147-48, n.4 (1990)(recognizing that the balancing test and policy considerations were identical to Exemption 7 of the FOIA, the Federal counterpart to the NRPA).

the information was apparently stolen by a cybercriminal and exploited by the media. The District Court has already compelled this matter to arbitration save and except for Plaintiff's challenge that she lacked the mental capacity to assent to the SCA. *See* ECF 72. To the extent that Plaintiff had the requisite mental-capacity and the SCA is enforceable, all facts and circumstances underlying the alleged incident are to remain confidential. Allowing public disclosure of LVMPD's investigative file before that determination would eviscerate a material purpose of the Parties' confidentiality agreement.

Protection of LVMPD's investigative file also serves Plaintiff's interests, as she previously expressed concern that she could be subject to retaliation and public humiliation and portrayed as falsely accusing Defendant because of his wealth and fame in an attempt to extort money. *See* ECF No. 1 at ¶¶ 20, 22, and 24. After the fact of the SCA was publicly disclosed, Plaintiff was quoted in an article, stating that she is "terrified," "scared," and "worried that someone might do something to her, that the media and Ronaldo's fans won't leave her alone." *See* Der Spiegel Article, attached hereto as **Exhibit D**. The article further reported that she has quit her job and has indefinitely disappeared and is now in an unknown location. *Id*. Thus, Plaintiff's interests are also served by prohibiting LVMPD's investigative file from becoming public, especially given the nature of her allegations.

Given the nature of the allegations at issue, the parties' private interest in confidentiality is significant and outweighs the public interest in disclosure. *See In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d at 428 (recognizing that in cases involving allegations of sexual misconduct, the private interest in confidentiality is significant). Public disclosure of LVMPD's investigative file will certainly result in improper use of the documents in order to promote a public scandal and circulate libelous statements, just as it has thus far.

/ / /

/ / /

/ / /

/ / /

/ / /

III.    **CONCLUSION**

      In light of the foregoing, Defendant respectfully requests that this Court grant his Motion for Protective Order, barring LVMPD from producing its investigative file concerning LVMPD Event No. 090613-1815 to the New York Times or any third parties and/or compelling return or destruction of all privileged and confidential documents.

      Dated this 1st day of December, 2021.

CHRISTIANSEN TRIAL LAWYERS

By _____

PETER S. CHRISTIANSEN, ESQ.
KENDELEE L. WORKS, ESQ.
KEELY A. PERDUE, ESQ.
*Attorneys for Defendant Cristiano Ronaldo*

11

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5 and LR-5.1, I certify that I am an employee of CHRISTIANSEN TRIAL LAWYERS, and that on this 1st day of December, 2021, I caused the foregoing document entitled **DEFENDANT'S MOTION FOR PROTECTIVE ORDER** to be filed and served via the Court's CM/ECF electronic filing system upon all registered parties and their counsel. I further certify that I served the following parties and/or their counsel by email as follows:

Jacqueline V. Nichols, Esq.
jnichols@maclaw.com
Counsel for Las Vegas Metropolitan Police Department

Jess Hui
Legal Department
The New York Times Company
jess.hui@nytimes.com

An employee of Christiansen Trial Lawyers

# EXHIBIT A

# EXHIBIT A

# MARQUIS AURBACH COFFING

Direct Line: (702) 207-6091
Direct Fax: (702) 382-5816
Email: JNICHOLS@MACLAW.COM

Albert G. Marquis
Phillip S. Aurbach
Avece M. Higbee
Terry A. Coffing
Scott A. Marquis
Jack Chen Min Juan
Craig R. Anderson
Terry A. Moore
Geraldine Tomich
Nicholas D. Crosby
Tye S. Hanseen
David G. Alleman
Cody S. Mounteer
Chad F. Clement
Christian T. Balducci
Brian R. Hardy
Jordan B. Peel

Jared M. Moser
Kathleen A. Wilde
Jackie V. Nichols
James A. Beckstrom
Collin M. Jayne
Alexander K. Calaway
Susan E. Gillespie
Tabetha A. Martinez
Robert P. Loftus, Jr.
Hayden R. D. Smith
Dominique Bosa-
Edwards
Nicholas J. Klein
Harry L. Arnold

John M. Sacco [Ret.]
Lance C. Earl
William P. Wright
Jennifer L. Micheli
Of Counsel

November 18, 2021

**Via Email: pete@christiansenlaw.com, kworks@christiansenlaw.com and keely@christiansenlaw.com**

Peter S. Christiansen, Esq.
Kendelee L. Works, Esq.
Keely Ann Perdue, Esq.
Christiansen Trial Lawyers
710 S. 7th Street, Suite B
Las Vegas, Nevada 89101

Re:   Kathryn Mayorga v. Cristiano Ronaldo
        Federal Court Case Number: 2:19-cv-00168-JAD-DJA

        LVMPD Event No.: 090613-1815
        Our File No. 14687-228

Dear Counsel:

     This office represents the Las Vegas Metropolitan Police Department in relation to the above-referenced matter.  The purpose of this correspondence is to inform you of a public records request LVMPD received from the New York Times for LVMPD's investigative files concerning Event No. 090613-1815, which involves Kathryn Mayorga and Cristiano Ronaldo.  In accordance with the Nevada Public Records Act, LVMPD is required to provide the New York Times with responsive public records of the investigation concerning Ms. Mayorga and Mr. Ronaldo.  After reviewing the investigative files, LVMPD determined that it will be providing the New York Times with various reports, including the crime report and property reports; voluntary statements, Declaration of Warrant/Summons, and communications to and from LVMPD regarding the investigation.  Pursuant to Nevada law, however, LVMPD will redact all personal identifying information of any victims.  *See* NRS 200.3771.  It is anticipated that these records will be provided to the New York Times on or about December 1, 2021.

Peter S. Christiansen, Esq.
Kendelee L. Works, Esq.
Keely Ann Perdue, Esq.
November 18, 2021
Page 2


      Please do not hesitate to reach out to my office if you have any questions or concerns.

                  Sincerely,

                  MARQUIS AURBACH COFFING

                  /s/ Jackie V. Nichols

                  Jackie V. Nichols, Esq.

JVN:kb


MAC:14687-228 4544378_1 11/18/2021 3:36 PM

# EXHIBIT B

# EXHIBIT B

From: **Kendelee Works** kworks@christiansenlaw.com 

Subject: Re: Letter to Defendant's Counsel (Christiansen Trial Lawyers) re public records (Mayorga v. Ronaldo) [IWOV-iManage.FID1089275]

Date: November 18, 2021 at 4:00 PM

To: Krista Busch kbusch@maclaw.com

Cc: Peter S. Christiansen pete@christiansenlaw.com, Keely Perdue keely@christiansenlaw.com, Jackie V. Nichols jnichols@maclaw.com, Attorneys attorneys@christiansenlaw.com



Hi Krista,

We appreciate the heads up.  Please be advised that we will be making a motion asking the Court to order that the file not be produced, or at a minimum, significantly redacted.  The procedural posture of the case is complicated but LVMPD's file contains documents provided to Metro by the alleged victim's current lawyer, which are privileged, attorney-client communications and work product that opposing counsel should never have had in the first place.  The Magistrate recently issued a report and recommendation that the entire case be dismissed as a result.  Attached for reference is a copy of the Magistrate's order, which is currently the subject of Objections by Counsel for Ms. Mayorga.

I'd like to schedule a meet and confer with Jackie as soon as possible please. I can be available anytime tomorrow or Monday. Please let me know what works.

Hope all is well with you.

Thanks,

Kendelee



20211007
Report...iew.pdf

Kendelee L. Works, Esq.
Christiansen Trial Lawyers
710 South 7th Street, Suite B
Las Vegas, NV 89101
Phone (702) 240-7979
Fax (866) 412-6992
www.christiansenlaw.com



This email is intended only For the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and/or exempt from disclosure under applicable law.  If the reader of this email is not the intended recipient, or the employee or agent responsible for delivering the email to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.

On Nov 18, 2021, at 3:42 PM, Krista Busch <kbusch@maclaw.com> wrote:

Please find the enclosed letter in the Mayorga v. Ronaldo matter.  Thank you.

<image001.jpg>

**Krista Busch** | Legal Assistant to

**Krista Busch |** Legal Assistant to
Jacqueline V. Nichols, Esq.
Collin M. Jayne, Esq.
10001 Park Run Drive
Las Vegas, NV 89145
t | 702.821.2412
f | 702.382.5816
[kbusch@maclaw.com](mailto:kbusch@maclaw.com)
[maclaw.com](http://maclaw.com)

🌲 **Please consider the environment before printing this e-mail!**

DO NOT read, copy or disseminate this communication unless you are the intended addressee. This e-mail communication contains confidential and/or privileged information intended only for the addressee. If you have received this communication in error, please call us (collect) immediately at (702) 382-0711 and ask to speak to the sender of the communication. Also please e-mail the sender and notify the sender immediately that you have received the communication in error. Thank you. Marquis Aurbach Coffing - Attorneys at Law

<Letter to Defendant's Counsel (Christiansen Trial Lawyers) re public records.pdf>

# EXHIBIT C

# EXHIBIT C

# Stovall & Associates
## Attorneys at Law

November 22, 2021

**Sent Via Email**
Jackie V. Nichols, Esq.
Marquis Aurbach Coffin
10001 W Park Run Dr,
Las Vegas, NV 89145
(702) 382-0711

Re:   **Mayorga v. Ronaldo, Case No. 2:19-CV-00168**

Dear Ms. Nichols,

I am responding to your November 18, 2021 letter regarding the above referenced matter. As you know I represent Ms. Mayorga.

My concern with the LVMPD's proposed release of the investigative files is my correspondence to Sergeant Comiskey dated August 21, 2018 and  September 24, 2018 and related documents. Attached to my correspondence are documents obtained from Football Leaks.

Within the federal litigation, the defendant has asserted these documents are attorney client and work product privileged documents under Nevada law. The defendant also contends it found additional documents within the LVMPD investigative file that were not attached to my correspondence which it claims are privileged. The plaintiff contends that under federal law of privilege and based upon the decision in *Superpumper v. Leonard, 137 Nev. Adv. Op. 43 (2021)* under Nevada law of privilege, these documents are not privileged due to defendant's failure to comply with Rule 26, waiver by the defendant's voluntary disclosure, failure to protect the privilege after disclosure and under the crime fraud exception. The Football Leaks documents disclosed within the federal case are also subject to a protective order.

Whether these documents are privileged is currently before the federal district court. Until this question is answered I would object to the release of the Football Leaks documents contained in the LVMPD file. I would be glad to identify the specific documents at issue in the federal court to avoid inadvertent disclosure of any Football Leak or related document pending the federal district court's decision. This objection becomes moot should the federal court agree with plaintiff's position.

# Stovall & Associates
### Attorneys at Law

Please advise if the LVMPD will withhold disclosure of the Football Leaks documents described herein, and if not, the basis for declining to do so. Your prompt response would be appreciated.

Sincerely,

Leslie Mark Stovall, Esq.

LMS/mh
CC: Kendelee Works, Esq.
     Counsel for Cristiano Ronaldo

# EXHIBIT D

# EXHIBIT D

Case 2:19-cv-00168-JAD-DJA   Document 161   Filed 12/01/21   Page 23 of 45

# SPIEGEL ONLINE

09/29/2018 11:59 AM

**Her Name Is Kathryn**

## The Woman Who Accuses Ronaldo of Rape

**An American woman claims Cristiano Ronaldo raped her in Las Vegas. Years ago, the soccer star paid her to remain silent. Now, the woman is going public for the first time and filing a complaint against Ronaldo. She possesses a document that could be extremely dangerous for him. By DER SPIEGEL Staff**

She was supposed to be invisible, damned to silence. Forever. Nobody was to ever learn about that night in Las Vegas back in 2009, especially not her version of events.

She even signed a settlement deal and received a payoff ensuring that she would never give voice to the accusations.

She signed, she says, out of fear for herself and her family. And out of impotence, the inability to stand up to him. And out of the hope that she could finally put the incident behind her. But, says Kathryn Mayorga, she was never able to close that chapter.

The American is a slender 34-year-old with long, dark hair and green eyes. Until recently, she worked at an elementary school. But she quit, she says, "because I need all my strength now."

She needs the strength to stand up to the man who she accuses of having raped her nine years ago -- accusations that he denies.

The man isn't just anybody. It is Cristiano Ronaldo, arguably the best soccer player in the world, with vast amounts of success, money and adoration from the fans. An anonymous woman versus Ronaldo -- the discrepancy could hardly be greater.

They met on June 12, 2009 in a Las Vegas nightclub. Ronaldo was there on vacation with his brother-in-law and cousin. It was the summer when the star, then 24, would transfer from Manchester United to Real Madrid for a then-record sum of 94 million euros.

Kathryn Mayorga, 25 at the time, was a budding model and one of her jobs was to hang out with other young, beautiful women in front of bars to lure in guests.

On that Friday in June, the paths of the model and the multimillionaire crossed in the

VIP section of Rain, a nightclub belonging to Palms Casino Resort. Paparazzi photos show Mayorga standing close to Ronaldo and talking. He is wearing a white shirt with a narrow black tie and she is in a light gray dress with gold jewelry. He plays it cool while she beams at him. Within hours, the gossip pages around the world would be busying themselves with trying to figure out who this "mysterious brunette" is at Ronaldo's side. The party continued in the early morning hours in Ronaldo's penthouse in the nearby Hotel Palms Place. And only two people know what happened in the bedroom there: Kathryn Mayorga and Cristiano Ronaldo.

What is clear is that the soccer star paid Mayorga $375,000 a few months later as part of an out-of-court settlement. In exchange, Mayorga signed an agreement to never talk about her accusations that Cristiano Ronaldo had raped her.

## A Perfidious Accusation

DER SPIEGEL reported on the non-disclosure agreement for the first time in spring 2017. The documents pertaining to the agreement were made available to the newsmagazine by the whistleblowing platform Football Leaks. In the reporting for that article, DER SPIEGEL contacted Mayorga, who appears in the story under the pseudonym Susan K. "No comment," was her response. When journalists encountered her in front of her home, she ran away.

When the first article appeared, Ronaldo's agency Gestifute released a statement saying, "the article is nothing but a piece of journalistic fiction." The statement continued: "The newspaper has based their entire narrative on documents which are unsigned and where the parties are not identified."

That portrayal is incorrect.

Numerous documents in DER SPIEGEL's possession prove as much, including some which have been signed by Ronaldo himself. The existence of those documents could help explain why he has not, in the last year-and-a-half, followed up on his threats to take DER SPIEGEL to court. In its public statement, Gestifute also discredited the alleged victim, saying she "refuses to come forward and confirm the veracity of the accusation."

It is a perfidious accusation. After all, the key element of the out-of-court settlement was that Mayorga was not allowed to comment on the incident. Should she do so, according to the deal, she would have to pay the money back to Ronaldo and possibly damages as well.

Now, though, she has decided to talk anyway, telling her story in detail for the first time.

Why? What made her change her mind?

Essentially, there are three reasons. First, she has a new lawyer, one who is both experienced and unflinching. He believes the non-disclosure agreement is not legally binding and he has filed a civil complaint against Ronaldo in Kathryn Mayorga's name. That complaint is supported by a 27-page document that could have far-reaching consequences for the football star. The document contains a version of how Ronaldo experienced that night, including the following quote: "She said no and stop several times."

Second, the world has changed for women who claim to have been the victim of sexual assault. One year ago, accusations against the American movie producer Harvey Weinstein were made public. According to those claims, he spent decades harassing, molesting or even raping women. Weinstein denies the accusations.

**Money, Power and Fame**

Once the scandal went public, the American actress Alyssa Milano encouraged women who have experienced sexual harassment to go public under the hashtag #MeToo.

Tens of thousands of women did so, changing the societal climate in the process. It has since become much more difficult for politicians, lawyers and the general public to ignore and play down sexual violence against women, particularly in cases where the suspected perpetrator possesses money, power and fame.

The #MeToo movement has also given many victims more courage and self-confidence. Mayorga is one of them. She says she has spent many hours in front of her computer reading the stories of other women.

The third reason is that she sees it as the only chance to learn whether there are other women out there who say they were sexually abused by Ronaldo. "It's something I've always wondered about," she says.

It's a few weeks ago in Las Vegas and Kathryn Mayorga is sitting at a long, dark conference table in the offices of her lawyer together with her mother Cheryl Mayorga and her therapist.

Kathryn is wearing black overalls and long, turquoise earrings. She has made herself up carefully, but the makeup can't completely disguise the tiredness in her eyes. For the last week, she says, she has been having trouble sleeping.

She seems exhausted, but she is also extremely nervous. Her eyes bounce around the

room as she repeatedly brushes back her hair.

Mayorga takes a deep breath. First, she wants to talk about her fears as she takes this next step and the words begin pouring out of her. "It's a pretty famous guy. So I'm terrified. I'm scared." She is worried that someone might do something to her, that the media and Ronaldo's fans won't leave her alone. "The reason why I signed the contract in the first place (was) because I didn't want my name out there."

She starts to cry, her breaths coming in shallow bursts. She rolls back in her heavy leather chair and buries her face in her hands. Her therapist is concerned, and they withdraw to a neighboring room for half an hour.

Her mother Cheryl, 66, remains behind, a diminutive woman with dark hair pulled up in a bun. She chooses her words carefully. "It's never left her. Every day, she lives it," she says. "There were times when she would call me and his -- he would be on a billboard or whatever, and she would just completely disintegrate. Having to walk into a store to get a pint of milk, and you've got his picture everywhere. (...) He's the soccer god that everybody thinks is just perfect and flawless. (...) And she can't even get out of bed some days." Cheryl Mayorga shakes her head. "It's just wrong. We're behind her 100 percent."

## 'Just Simple People'

By "we," she means the entire Mayorga family. Kathryn's father Larry, 64, and her brother Jason, 37, describe how that night nine years ago changed Kathryn.

She was born and raised in Las Vegas. Her father, who is now retired, worked as a fireman for 32 years while her mother spent most of her time taking care of the children. "We're just simple people," says Cheryl.

Kathryn played softball and soccer and was a member of the Girl Scouts. But, her mother says, she suffers from Attention Deficit Disorder and has a learning disability. Her daughter has trouble concentrating and keeping her thoughts straight, Cheryl says, which is one reason she sometimes speaks so quickly.

The door opens and Kathryn Mayorga comes back into the conference room. She appears to have regained her composure. Her mother provides a quick recap of what she said in the interim. "I did struggle a lot growing up," Kathryn says. "It's hard for me to learn in a classroom experience. I have documented disabilities (...) and was given extra time," she adds: "I busted my ass at school and wanted to prove something." She got her degree in journalism at the University of Nevada, Las Vegas.

She talks about growing up in one of the entertainment capitals of the United States. "We had so much fun. We'd go to hotel parties, we'd go out and do things. (...) We would literally go, have a few drinks, dance all night, and leave." She adds: "I like control."

Shortly after her graduation in 2008, she married her boyfriend, a bartender from an Albanian family who also got the odd job repairing computers, including those belonging to her parents. "At that age, I'd graduated college, I need to be married, I had that pressure," she says. "And at first, I was on board with it."

But it wasn't meant to be. Around a year after their wedding, the couple split up and Mayorga moved back in with her parents, whose home is in one of the better neighborhoods of Las Vegas, complete with a well-tended yard, a large garage, a beautiful pool and a nice view over the city.

"I was really enjoying myself," says Mayorga. "I was working out every day, eating vegan ... doing a lot of good stuff with modelling." She says she also travelled a lot during that period, something made possible by her job hanging out in front of bars.

## The Night that Changed Her Life

Mayorga leans forward in her chair, a resolute look on her face. "They tried to discredit me," she says, referring to Ronaldo's legal team. "They tried to say: 'Well, the job you have is not a "good girl" job,'" she says, adding that it was a normal job. "They liked us to hold a drink like we're out and mingling with our friends. So you get a water, you need something in your hand like you're actually engaging with your friends. You're on a night out with the girls."

Exhausted, she leans back to collect herself. Then she begins to tell the story of that night -- the night that she says destroyed her life. The night that she describes as though a video of it was playing in her mind's eye, even though it was so long ago.

She was working that night too, and later went partying with her friends. There was champagne on offer, but, she says: "I had a little, but I was on a strict diet."

Then she got a message from her girlfriend Jordan, whose name has been changed for this story. They met in Rain and went into the VIP area. "Jordan's very into the nightclub scene, she knows a lot of people," she says. "He just came up to me ... grabbed my arm, and he was like: 'You! Come with me!' I was like, are you joking?"

She knew who he was and that he was partying in the club that night. "Jordan told me he was there. I figured she knew that from her soccer boyfriend," she says. "People

were talking about him: 'Oh, he's here. He's famous.' And I was like, 'I think I've looked him up before.'"

Ronaldo laughed at her, she says, because she didn't immediately want to join him. Then he got her a drink, she says, and introduced her to his entourage. "'This is like my brother,' and he introduces me to some guy and people we were with. And 'this is like family,' this guy and this guy."

They chatted for a bit and then she says he asked for her telephone number. "I gave him my number and he just left.... And I was like, 'OK, cool.'"

Mayorga says that she then went looking for Jordan and found her outside with a couple of friends. At that moment, she says, a text message from Ronaldo appeared on her phone that read something like: "Hey, bring your friends. Come up to this party." She and Jordan decided to take up the invitation at the Palms Place, the hotel next door. Ronaldo and his entourage, Mayorga says, were waiting in the lobby, where they told the girls that the party had already ended.

"He's like, 'we're going to do our own party.' I pull Jordan aside and I think I said to her: 'Let's just take a picture and then let's go.' There's actually a really nice view."

## In Walks Ronaldo

In 2009, the Palms Casino Resort was the place to be in Las Vegas. Ronaldo had apartment 57306, one of the penthouses, where a night goes today for around $1,000.

The apartment includes a kitchen, a large living room and two bedrooms, each with a luxurious bathroom attached. On the balcony is a Jacuzzi with a view out over the city.

Once they arrived in the suite, Kathryn recalls, everyone suddenly jumped into the whirlpool and Jordan sat down at the edge. "We were like, 'these guys are cute.' But still, it's late. And I had a photoshoot that morning." She adds: "I didn't want to get in the water to ruin my dress."

Ronaldo, Mayorga says, offered her something to wear in the Jacuzzi. "Jordan was having fun and she was in town and I wanted her to have fun, so I said: 'You know, I'm going to go put these clothes on.'"

She says she then went to the bathroom to change, one of the ones attached to a bedroom. Just as she was standing there only in her panties, she says, Ronaldo suddenly walked in, his penis hanging out of his shorts.

As she tells her story, Mayorga pauses briefly and opens her eyes so wide that the whites of her eyes became visible around her pupils. "Basically he ... he begged me to touch his penis for 30 seconds."

She shakes her head. "When I wouldn't touch it, he begged me to suck it. Like, what an idiot! (...) I was laughing at him because I thought, 'Is this a joke?' This guy that is so famous and so hot ... he's a frickin' loser and a creep." But Ronaldo wouldn't be put off. "He was like, 'I'll let you go if you give me a kiss.' I said, 'OK, I'll kiss you but I'm not going to touch your nasty penis.'" Mayorga swears that she only kissed him and didn't otherwise touch him.

The kiss, though, she says, only turned him on more. "He starts to come on to me very strong. And he starts to do stuff to me and touch me and grab me and go down on me. I pushed him away and kept saying 'No.'"

At that moment, she says, one of his friends came in and asked: What are you doing? "I immediately grabbed my dress and put it on. And I said: 'We're leaving right now.' And I looked at him. He said: 'Yeah, yeah. We'll leave.'"

Mayorga sits quietly for a moment before continuing. "I thought everything was over." But it wasn't, she claims. "He pulls me into the room. I still wasn't afraid at all. I was just like, 'Man, this guy's adamant.' The most adamant I've ever dealt with. I explain to him: 'Listen dude, this is not going to happen.'"

**'No, No, No'**

But Ronaldo allegedly didn't give up. "I turned away. He tried to take my underwear off. I turned away from him and curled up into a ball. And I was holding my vagina. And that's when he jumped on me." She says she said "no, no, no, no."

Ronaldo, Kathryn Mayorga claims, raped her anally. Without a condom. Without lubricant.

"After he assaulted me, he wouldn't let me leave again. He wouldn't let me leave. And he was calling me 'baby, baby.' He gave me this look, this guilty look. Almost like he felt bad. I don't remember but I'm pretty sure he said 'sorry' or 'Are you hurt?' And by this time, he's (...) on his knees. He says the 99 percent thing." He insisted, she says, that he was "a good guy" except for the "one percent."

That was the moment, she says, that she first understood what had happened to her. "It happened so quick. I didn't really know what happened. (...) I felt like I was actually floating almost. It felt like I wasn't there. It was out-of-body. I really can't describe it in

words." Next, she says, "I thought I had some disease. I thought he had fucking AIDS. So I was like: 'You have to tell me if I have a disease. Do I have a disease?' And he's like: 'No, no. I'm a professional athlete and I get tested every three months. I couldn't play my game with a disease.'"

For a moment, it is completely still in the conference room in Las Vegas. Kathryn Mayorga stares at the table in front of her. Her father, Larry, has joined us in the lawyer's conference room, quietly taking a seat. He is wearing a black T-shirt and a black baseball cap. He is a man who likes to laugh, but the longer he listens to his daughter, the more anger and helplessness are reflected in his face. His daughter, he would later say, had never before opened up so much.

Then Kathryn Mayorga begins to speak again. "I said: 'No one's going to know about this.' He might have asked me to be cool when I walked out. I don't remember though."

There is one person who says she still remembers seeing Mayorga come out of the room: her friend Jordan. "Kathryn looked totally disheveled. Her hair was messed up, her make-up smeared," Jordan says. She says she kept asking Ronaldo "What did you do to my friend?"

Mayorga recalls the scene similarly. In response to Jordan's question, both women say, Ronaldo only answered: Everything's fine. We're friends.

"I was in a trance," Mayorga says. They sat down at the edge of the Jacuzzi. "At first, he sat next to me, and I moved away because I didn't want to be near him." She continues: "Jordan said I was staring at the water (but) I don't remember staring at the water. (...) Then it got quiet and awkward. He finally got up and he left. As soon as he left, all I remember is falling into the Jacuzzi."

## A Dangerous Document

She bends deeply forward in her chair. It looks as though she's suddenly thinking that her fall into the Jacuzzi might make her look bad. Again, she starts talking extremely quickly. "I had some wine at work," she says, and that she drank a sip or two of champagne afterwards. "I was dead sober. One-hundred percent."

The fall into the water, she says, helped her collect herself a little bit. She said to herself: "OK, you've got to be cool now! Jordan kept asking me (if I was OK). I started laughing and (...) I said: 'No, no, nothing happened. God, I can't believe we're ... look at the view!'" She shrugs her shoulders, but the gesture seems more forlorn than indifferent. She says they then left. "His friends gave me a towel."

On the way to the elevator, she raved to Jordan: What a night, what fun! At some point they said goodnight to each other.

It was only when she finally got to her car that the pain started. "Every heartbeat I remember was like a piercing pain." She says she drove to a hospital but was afraid of going inside. She then drove home and lay in her bed at home and tried to sleep. But couldn't.

Just a few hours later, she got a call from Jordan. "She was like, 'We're all over the news!'" At the same time, says Mayorga, she was getting text messages asking: Are you dating that famous soccer guy? Only then did she see the pictures. "They were everywhere. Every news outlet." The photos showed her flirting with Ronaldo in the VIP area of Rain.

She says she immediately told Jordan, that's not good, that's not good. But Jordan, she says, didn't understand what she meant -- until she finally came out with it: "Jordan. He raped me!"

Jordan, she says, was deeply concerned and immediately advised her to be careful, saying that football players have a lot of power. In such cases, she said, there is no such thing as justice.

When the pain refused to subside, she started to worry. "I was like, 'I'm really in pain.' And I was kind of panicking," says Mayorga. She says she called a childhood friend of hers and told her what had happened. The friend advised her to call the police anonymously.

**'Bigger Than You Think'**

"I didn't want them to know who I was," she says. "I was like, 'I'm not going to say his name. I'm not going to say his name. (...) I said, 'I need someone to take me to the hospital.' I wanted to get that rape kit done. (...) So they come, and the sergeant and like five cop cars and it was like this huge mess!"

Together, Kathryn and her parents try to reconstruct what police officer said what to whom and when. Their memories diverge slightly, and ultimately the only thing they can agree on is that the police were there. And that someone put her dress and underwear into a plastic bag and carried them out of the house. At some point much later in the day, Kathryn Mayorga says she finally gave in to her mother's urging and told her what had happened.

Larry Mayorga starts speaking. He remembers standing outside in his firefighter

uniform. "The detective told me that whoever assaulted her (...) 'Whoever did it, your daughter needs to let us know who this is.'" He looks at his daughter. "And then I talked to you and you refused." He says his daughter then told him: "'You don't understand dad. This is bigger than you think.'"

There is a recording of Mayorga's call to the Las Vegas Metropolitan Police Department at 2:16 p.m. on June 13, 2009. In the so-called "computer-aided dispatch" or CAD report, which DER SPIEGEL has obtained, her report has a case number which later makes an appearance in the out-of-court settlement between Kathryn Mayorga and Cristiano Ronaldo.

In the CAD report, under the heading "Type," which refers to the kind of complaint it records, the number 426 can be found. It is the code for sexual offenses.

The police officer who spoke with Mayorga noted that the caller was extremely distraught and did not want to provide the name of the alleged perpetrator. All she would say is that it was a "public figure" and an "athlete." The officer noted down that she had not bathed.

The report also notes that the police arrived at the Mayorgas' home shortly after 2:30 p.m. on that Saturday afternoon. They radioed back to headquarters on several occasions, where an officer noted that the alleged victim wanted to go to the hospital for a rape kit examination, which is performed on victims of sexual violence to secure evidence and to examine and photograph possible injuries.

The police brought Mayorga to the University Medical Center just before 4 p.m. The CAD report notes that at 5:15 p.m., she had offered vague information about the alleged scene of the crime, saying that it was a hotel "near" Flamingo Road, where the hotel Palms Place is located.

"They kept trying to make me say his name. And I was like 'I'm not going to say his name,'" says Mayorga. They also wanted to know where it had happened, but she was scared of providing too many details. Only the nurse who examined her, she says, showed understanding. "She's like: You need to be worrying about yourself right now. (...) You're doing the rape kit, so if you want to (prosecute) later on, you always can."

## Three Months to Cry

The examination report shows that Mayorga was treated in the hospital for two hours. It reveals that she was "anxious, cooperative, pleasant." She said that she occasionally drinks alcohol and she was tested for drugs, but the results came back negative.

In a checklist, the nurses recorded what Mayorga had done after the alleged rape: changed clothes, brushed her teeth, urinated, ate and drank.

Under the category reserved for the type of attack, the nurse noted "patient's rectum penetrated" and that ejaculation had occurred "in assailant's hands."

They tested her for sexually transmitted diseases and swabbed her mouth and rectum on the search for possible traces of DNA. Her injuries -- a circumferential swelling with bruising and a laceration -- were photographed. She was then given Zithromax and Rocephin, two antibiotics, and released.

In the ensuing days, she hardly left her room, she says. "I felt sick and I felt confused. And I still had no emotion. No emotion. Through this whole thing ... it took me three months to cry."

Her mother Cheryl interjects: "I wanted to hold her. I wanted to comfort her," she says. "We tried to go in (to her room), and she's: 'Get out!'" She says she then engaged a lawyer. The police "told her she was going to have all these hospital bills and medical bills" if she didn't say his name, says Cheryl.

A friend recommended a lawyer named Mary Smith, whose name has been changed for this story. At the time, she had a small practice in Las Vegas. The Mayorgas describe Smith as friendly and kind-hearted. Looking back, though, they think it was a big mistake not to have contacted a lawyer with more experience in such matters.

The lawyer advised her to make a complete statement to the police. And two or three weeks later, Mayorga estimates, a police officer came and recorded her statement.

As part of this statement, she also mentioned Ronaldo's name. "I printed out pictures of him. Because the guy didn't know who he was." International soccer stars, after all, aren't necessarily well known in the U.S.

The officer, she says, was an older man. When she told him that she had kissed Ronaldo in the bathroom, she says, the officer reacted by saying: "'Uh-oh, that's going to be a problem, that's going to be a problem!' And he's like: 'Well, just so you know, you getting an attorney, that doesn't look good,'" Mayorga recalls. "He was just like reaming me. And I said, 'My parents told me to get the attorney!'" She adds: "I didn't know what to do. I'm trying to hide this! I didn't really want this out."

## She Wanted Justice

In the end, she pleaded with the police officer to do nothing with her statement, saying

that she still needed some time and that she wasn't emotionally stable. He promised her, she says, to wait until she was ready.

From that point on, Mayorga was trapped in this dilemma: On the one hand, she didn't want to go public with her name or his. On the other, she wanted justice. Her lawyer, she says, then proposed clearing up everything out of court.

In the U.S., sexual assaults are often reconciled with out-of-court settlements, with victims and perpetrators reaching an agreement without the case ever going to trial.

Sexual assault is the most serious crime in the state of Nevada after murder. If convicted, a person faces life in prison. But for a conviction to occur, guilt needs to be determined beyond reasonable doubt -- and that is especially difficult with sex crimes. Often, it's one person's testimony against that of another.

Many victims decide to pursue civil rather than criminal proceedings. The goal of the former is not to convict the alleged perpetrator but to indemnify the victim financially. The burden of proof is considerably lower in such proceedings. It only needs to be more than 50 percent likely that the alleged perpetrator committed the crime.

But a civil proceeding also has its drawbacks. Although the victim can apply for the case to be tried under a pseudonym, it is public and, of course, there is no guarantee that the person's anonymity will remain protected.

For this reason, many victims decide to resolve their case out of court, for example by mediation, in which a neutral person acts as mediator. It then ends in a settlement agreement.

This kind of procedure can be advantageous for both sides. The identities of the perpetrators and victims can be protected. The entire process is shorter than a trial. The distressing details of the rape don't necessarily have to be rehashed.

These arguments made sense to Mayorga. "I wanted to teach him a lesson. I wanted him to deal with it, to have to face me," she says. She also says that she wasn't looking to enrich herself, but she wanted him to pay for her treatment. "I'm not going to pay for my goddamn treatment," she says, describing her thinking at the time. "He raped me. He's going to pay for my goddamn treatment!"

**The Questionnaire**

The Football Leaks documents show that Mayorga's lawyer Mary Smith contacted a lawyer of Ronaldo's in England in mid-2009. She said she represented a plaintiff in Las

Vegas in a case against the football player. The lawyer forwarded the mail onward to Ronaldo's Portuguese lawyer Carlos Osório de Castro, who has represented Ronaldo for years on all kinds of legal matters.

"What do you think this is about?"

Osório de Castro answered: "No idea."

By the end of July, it was clear that it was serious. Several lawyers had become involved in the case by then, including one based in California who had represented several prominent personalities in court. Ronaldo's lawyers discussed what the best course of action might be.

A list containing hundreds of questions was submitted to Ronaldo, his brother-in-law and his cousin. In the document, Ronaldo is referred to as "X" while Kathryn Mayorga is referred to as "Ms. C."

There are several versions of the questionnaire. The questions remain more or less consistent on all of them, but the answers do not.

In one version from December 2009, Ronaldo speaks of consensual sex and that there had been no indication that she wasn't OK with it during sex nor did it seem that she wasn't doing well afterward.

But there is another, much earlier version. It is the document that could have serious consequences for Ronaldo. It was sent via email in September 2009. The sender was a lawyer from Osório de Castro's firm. The recipients were Osório de Castro himself and an additional colleague.

In response to the question as to whether Ms. C. ever raised her voice, screamed or called out, X responded, according to the document: "She said no and stop several times."

In the document, X says that she was lying on her side. "I entered her from behind. It was rude. We didn't change position. 5/7 minutes. She said that she didn't want to, but she made herself available." And further: "But she kept saying 'No.' 'Don't do it.' 'I'm not like the others.' I apologized afterwards."

He is quoted in the document as saying that she never screamed and never called out for someone.

**Ticking Clock**

Case 2:19-cv-00168-JAD-DJA   Document 161   Filed 12/01/21   Page 36 of 45

Question: Did Ms. C. say anything afterwards about the sex being too brutal?

X: "She didn't complain about it being brutal. She complained that I forced her. She didn't say anything about wanting to go to the police."

In the answers to the list of questions, Ronaldo confirms Mayorga's version on the following points: She said no several times. And he apologized afterwards.

Their stories contradict each other on several points. One of those is whether Mayorga pleasured Ronaldo with her hand. He says she did, she says she didn't. Ronaldo says they engaged in foreplay in the bathroom. He also portrays their encounter beforehand in the club differently: He says the women had asked to be let into the VIP section and had had a few drinks. He also says they didn't exchange numbers, but that he invited the women to his hotel straightaway. Mayorga, according to some of Ronaldo's companions, didn't appear disturbed in any way when she later emerged from the room.

In December 2009, Ronaldo's lawyer Osório de Castro upped the pressure on the American members of the legal team: "The clock is ticking and we must decide how to proceed and prepare for the battle."

In the meantime, Ronaldo's lawyers in the U.S. had hired a private detective to find out all they could about Mayorga. He collected details about her life, gathered information about parking tickets and the like, watched her house and spent hours shadowing her.

In one entry, he noted: "At approximately 8:00 PM Kathryn Mayorga arrived at the MGM Grand Hotel/Las Vegas. Mayorga drove her personal vehicle and parked in the self-parking garage. She exited her vehicle and walked to the hotel. She was met at the elevator by an individual (...). They embraced at the elevator." On another day, he observed her in a restaurant: "Mayorga was drinking red wine. She had over three (3) glasses of wine."

Mayorga had noticed that she was being followed. On one occasion, she went to lunch with a friend and "there was an investigator looking at us and writing notes down. And we were laughing, like: 'Could you make it obvious!' He was just looking at us and writing."

Her father Larry says: "I took her to the gym, working out (teaching) her how to punch, stuff like that. She wanted to learn how to defend herself. We worried about her back then."

Ultimately, the bill for the private detective, according to the documents, ended up being tens of thousands of dollars, but Ronaldo's lawyers weren't happy with the results.

One of the American lawyers insisted in an email that a second private detective be hired in an effort to discount the alleged victim's claims that she has been suffering psychologically from the consequences of the crime. "Hopefully," the lawyer wrote, we can "discover the occasions between now and Jan. 12 that (she) does go out and enjoy the nightlife and the men of Las Vegas."

Ronaldo's lawyers also apparently considered filing charges against Mayorga for blackmail. The problem with that strategy, though, is that she hadn't named a sum nor had she made any other demands.

The two parties met on Jan. 12, 2010, in Las Vegas. An experienced mediator was on hand and Ronaldo's team of lawyers drove up in a limousine. The football star himself did not make an appearance.

**'I Wanted Him to Deal With It'**

When the mediation began, Mayorga was in one room with her lawyer while Ronaldo's legal team was in a neighboring room. Mayorga's parents and brother were sitting in the hallway outside.

"It was stressing me out" says Kathryn Mayorga about that day. Her face is vacant, the fingers of her right hand stroking her turquoise earrings. "I wanted him there at that meeting. I wanted him to deal with it, to have to face me. That's what I wanted most of all."

She says that the mediator went back and forth between the two rooms to tell each side about the arguments presented by the other and, ultimately, to come up with a settlement.

Ronaldo's lawyer Osório de Castro had travelled to Las Vegas for the meeting, during which he sent text messages to his client. "The mediator now says that she has broken out in tears and that she is shaken because she thinks you're not interested in this matter and are someplace else altogether," Osório de Castro wrote: "So far, there has been no talk about money, but that's coming."

Ronaldo answered, "OK."

Forty-seven minutes after the first SMS, Ronaldo received a second message from Las Vegas. This time, it was just a number: "950,000 dollars." It appears to be the sum that the counterparty was seeking in compensation. Ronaldo wrote back: "That's the amount?"

Osório de Castro answered: "That is the first demand: That's 660,000 euros. We won't accept it. The negotiations are continuing."

Ronaldo then asked: "Is that too much?" Osório de Castro replied: "I think so. I think we'll close this for less."

Ronaldo then demanded: "It has to be less!" His lawyer replied: "OK."

Mayorga's family was sitting outside the room. Recalling that day, they say they could hear their daughter crying and screaming through the door. "They said horrible things, like they basically tried to say that I was a hooker, that because I did that modeling job, that that was hooker-ish. (...) I don't even know how they sleep at night," says Kathryn Mayorga.

"I was just so angry," says Kathryn's father Larry. "I was so mad that I couldn't go in there for her. (...) I just stepped back and said: 'Bite your tongue, Larry, and just.... This is her life and this is her decision. She's an adult.'"

Kathryn's brother clearly remembers the day of the mediation. The whole experience "was absolutely disgusting. It was horrible," he says. "Ronaldo's room was full of lawyers. (...) You could hear them laughing and joking," he says. "And then in the other room, (my sister) is crying."

## 'Just Despicable'

Just like his parents, Jason Mayorga says he had a bad feeling about the talks. Kathryn's lawyer, he says, agreeing with his parents, "didn't seem like she had a handle on things." When the mediator would go into the room with Ronaldo's lawyers, he says, "it was like: 'Hey guys! I'm back again!' You know, just despicable!"

Kathryn Mayorga says that at some point, all she could do was lie on the floor. "I was hysterical, I couldn't even talk. I was completely unstable." Her lawyer suggested at that point that the negotiations be stopped. "I was too unstable to sign that paper." But, she says, she knew it was now or never. "I was like: 'I will never go through this again. This will break me next time. I cannot do this again. If I walk away now, having to do this again will just break me.'"

At the end of the day, Osório de Castro wrote to his client: "We are finally finalizing this after 12 hours for 260,000 euros. On top of that will be the costs for mediation that I already told you about, plus a few payments to the lawyers who are now trying to formalize the transaction. I know that is a lot of money, but I think it was the best way out -- and it also wasn't easy to get at all."

The sum that Ronaldo was supposed to pay to Kathryn Mayorga was formalized in a so-called "Settlement Memorialization:" $375,000. At the time, that's how much Ronaldo earned each week at Real Madrid.

The lawyers worked on the precise wording of the agreement into the summer, adjusting paragraphs and modifying formulations. One issue addressed, for example, was how much Mayorga was allowed to say during her therapy sessions. Ronaldo's legal team insisted that she be prohibited from mentioning his name even to her therapist and demanded that she not be allowed to complain about him. They even went so far as to insist that she not speak about him to her family. This would create a hard-to-control atmosphere, one of his lawyers wrote in an email.

Ronaldo's lawyers sought to guarantee the elimination of any possibility that the secret would ever be revealed. The question of how Mayorga would pay taxes on the settlement money also arose. If she didn't do it, the lawyers worried, the U.S. tax authorities might develop an interest in the sum in her bank account and she would have to explain where she got the money from.

As part of its reporting for this story, DER SPIEGEL learned that Ronaldo's lawyers chose to wire the $375,000 from the account of a company named Tollin, based in the tax haven of British Virgin Islands, a company that had kept Ronaldo's advertising and sponsoring revenues for years. As such, it appears that Ronaldo paid for the Las Vegas case using sponsor money. DER SPIEGEL queries on the matter went unanswered.

The final out-of-court settlement included 11 clauses. The most important of them is the one prohibiting Mayorga from ever speaking about the incident and requiring her to drop all accusations against Ronaldo. And she was required to "provide her certification that she has permanently destroyed or deleted any and all electronic, written or other materials generated or received as a result of the alleged events."

**The Letter**

Among those documents is a letter. Because Ronaldo failed to come to the arbitration meeting, Kathryn Mayorga insisted that she be allowed to write him a letter that had to be read to him within two weeks. The requirement was part of the settlement document.

DER SPIEGEL has obtained a copy of the letter which is almost six pages long. It is difficult to read. Essentially a long, desperate wail.

"I screamed NO NO NO NO NO NOOOO over and over I begged you to stop."

"You jumped on me from behind," she writes, "with a white rosary on your neck!! What

would God think of that!!! What would God think of you!!!"

"I hope you realize what you have done and learned from this terrible mistake!! Don't take another woman's life as you did mine!!"

"I don't care about your money that was the last thing I wanted!! I wanted justice! There really is 'no justice' in this case."

In addition to Mayorga, several lawyers also signed the settlement, with the Portuguese lawyer Osório de Castro signing on behalf of Ronaldo. The football star himself appears in the document under the alias "Topher." A "Confidential Side Letter Agreement" makes it clear that the pseudonym refers to the football player. And that paper was signed by Ronaldo himself.

The signatures on the documents meant that for Ronaldo, the Las Vegas case was over.

For her, though, Mayorga says, it was just the beginning of an extended period of suffering.

Her mother says the first years were bad. "She just became, like, more insecure. She pushed us away. Totally. Totally shut down ... became this shell. You want to go in and say, 'Let us do something. And help.' And she would push us away," she says, her voice cracking.

"I had serious suicidal thoughts," Kathryn interjects. "She did," her mother agrees.

Her father says: "I didn't realize that this was going to continue to be with her." He adds: "I thought she could get over it. But she never did. It just ... she's not the same person."

"Before the incident, she was like my little sister," says her brother. "We'd go out to eat, dinner, we'd hang out, go to parks, see movies, stuff like that." Now, though, things have changed, he says. "She has so much pent up aggression (...) a complete demeanor change."

Shortly after the police officer finished recording her statement, Kathryn Mayorga began going to therapy. "I wasn't allowed to mention the name to my therapist," she says. "I always had to be careful what I said because of my contract."

## Punishment from God

She says she only took part a couple of times in group therapy sessions for rape victims. It is one of the moments during our interview when her eyes filled with tears. "I

Druckversion - Her Name is Kathryn: The Woman Who Accuses Ronaldo of Rape - SPIEGEL ONLINE - International    5/3/19, 12:32 PM

Case 2:19-cv-00168-JAD-DJA    Document 161    Filed 12/01/21    Page 41 of 45

just listened to other people," she says. "I've had incidences where women get upset with me, like, 'Why are you here? If you're not going to share it, don't come here.' I've had girls be really mean to me because I don't want to share."

In the first five years after her encounter with Ronaldo, she was obsessed, she says once she regains her composure. "I was obsessed with karma." Every day, she says, she would check the internet to see if anything had happened to Ronaldo, a punishment from God, so to speak, for what he had done to her.

She says she had to quit her job. Even just seeing the hotel with its illuminated letters was too much for her. Doing something with her university degree was out of the question, she says. And the thoughts of suicide kept returning. Only when she was traveling, she says, did she have a sense of freedom, far away from everything. But not always. "I go to Italy and he ... he's famous there! So it's like every little kid's wearing his shirt." A smile struggles onto her face.

In the first year, she drank a significant amount of alcohol, she then admits. "Yeah, so for ... about a year I drank every day," she says. "And it was for me, that was where I felt normal." But with her friends and on Facebook, she says, she tried to act as though nothing had changed.

Only after five years, Kathryn Mayorga says, did she start to feel a bit better. Not to the point that she would have been able to be in a normal relationship, "but after the fifth year I started becoming more happy."

To a large part, that had to do with her new job. She started working as a physical education teacher in an elementary school. "Teaching really helped me with my depression and my anxiety. Working with children ... the kids always had me stimulated," she says.

But she was never actually happy, she says. "I've had like these serious breakdowns. And again, blaming of the rape. And I blame him, and I blame myself for signing that thing."

### Denials

And then, in spring 2017, the article appeared in DER SPIEGEL. "Everything was there that nobody was supposed to know about. I read the comments...." Kathryn Mayorga presses her lips together. "I care what people think." Among the online comments pertaining to the story were things like: "As if Ronaldo even needs to rape a woman."

"That's what I thought," Mayorga says quietly.

Prior to the publication of that article last year, DER SPIEGEL gave Ronaldo the opportunity to comment on the accusations. In an email sent on April 10, 2017, a list of questions was sent to him. His Munich lawyer Johannes Kreile answered on his behalf: "We categorically reject the accusations raised in your questions," he replied. He added that his client would "take action against any untrue factual claims as well as any violation of his right to privacy." The lawyer also demanded that DER SPIEGEL "desist from reporting" on the matter.

On the day it was published, the article made waves internationally. But the Gestifute statement was quoted just as often, in which the story was branded a work of "journalistic fiction."

Four days later, Ronaldo scored three goals in a Champions League match against Bayern Munich and then three more against Atlético Madrid. The Mayorga story quickly faded into the background.

When a second DER SPIEGEL article on the accusations hit the newsstands, Ronaldo posted a video of his oldest son, Cristiano, Jr. The video shows the six-year-old shooting a penalty shot just like his father. The video was viewed 12 million times.

On Facebook alone, Ronaldo has 121 million followers.

Partly out of fear that Ronaldo could start looking for who the source was for the DER SPIEGEL article, Mayorga found herself a new lawyer.

Leslie Mark Stovall, 65, is a different caliber than her first legal representative. His gray hair pulled back in a pony tail, Stovall has been practicing law in Las Vegas for the last 30 years. There are those who recall him showing up in court wearing jeans and a cowboy hat.

Stovall has plenty of trial experience in the courtroom, even representing himself on one occasion. In 2001, he filed an incorrect tax return, he admits during his first meeting with DER SPIEGEL. He was suspended from the bar for two years. "I can't sugarcoat it," he says. Stovall is eager to avoid giving his opponents any openings.

## The Legal Strategy

Stovall studied the files pertaining to Kathryn Mayorga's case for several months in preparation for the civil complaint against Ronaldo. "Our claim seeks to have the settlement and non-disclosure agreement declared void," Stovall argues. "Kathryn was not competent to enter into the agreement because of the psychological injury she sustained from the sexual assault," he adds. "And that renders it voidable."

According to Stovall, Ronaldo's legal team was aware of Kathryn Mayorga's psychological weakness. And more than that: "They developed a strategy that took advantage of her emotional state." Mayorga's condition was also discussed in emails exchanged between Ronaldo's lawyers.

Stovall arranged for Mayorga to undergo an examination in April of this year by a forensic psychologist. In his diagnosis, he found that she is suffering from post-traumatic stress disorder and clinical depression as a "direct and exclusive consequence of Mr. Ronaldo's sexual assault perpetration."

In addition, he says that her learning disability was not accounted for during the arbitration session. As such, he argues, she was unable to truly recognize the consequences of the agreement and the legal terminology it includes. Thus, she did not ultimately have the necessary competence to sign the document.

But the out-of-court settlement, Stovall believes, is also invalid for another reason. "In my opinion," he says, "those documents are evidence of a criminal conspiracy to conceal and obstruct the prosecution of that sexual assault."

And then Stovall goes even further. "It is absolutely legal to defend yourself. It is absolutely appropriate for a person who has committed a crime to hire investigators and lawyers to go out and do the best they can to defend that individual. But there is a line. And the line is: Those individuals cannot obstruct justice. They cannot obstruct the process of investigating a crime and the prosecution of a crime. When you cross over from defending a criminal to obstructing, concealing criminal activity for the benefit of your client, that in and of itself is a crime! And that's what has occurred in this case. In my opinion."

## Pinocchio

He refers to Harvey Weinstein and the American actor Bill Cosby. "These serial sex offenders appear to me to be enabled by ... a team of lawyers and others who go out and use these agreements to suppress prosecutions, and it enables these people to continue to engage in sexual assaults."

Filing a complaint against Ronaldo's lawyers, Stovall says, could have a lasting effect. "I don't know if these lawyers would be willing to do this if they were at risk of criminal prosecution."

There is also, though, reason to believe that Ronaldo's side may have violated one of the clauses of the out-of-court settlement itself. As part of the settlement, Ronaldo's lawyer Osório de Castro agreed to read his client the letter from Kathryn Mayorga within

Case 2:19-cv-00168-JAD-DJA   Document 161   Filed 12/01/21   Page 44 of 45

two weeks of receiving it. The American lawyer sent a reminder to Ronaldo's Portuguese lawyer at the end of September 2010. "By my calculation," the lawyer wrote, "tomorrow is two weeks since the letter was delivered to you. Accordingly, please confirm if the letter has been read to Topher." Topher is a reference to Ronaldo.

Just over an hour later, Osório de Castro responded: "I confirm that the letter has been read to Topher by me." Osório de Castro also copied the email to a fellow lawyer in Portugal. That lawyer's response consisted only of a single word: "Pinocchio."

In its statement denying all allegations against Ronaldo, his agency Gestifute likewise states that this "alleged letter" from the "so-called victim" was actually "never received" by Ronaldo.

Kathryn Mayorga, for her part, is focused only on one thing, she says: preparing as best she can for what lies ahead. She has quit her job at the elementary school and has indefinitely disappeared and is now in an unknown location. She is no longer reachable.

Cristiano Ronaldo has also been unreachable. In the last year and a half, DER SPIEGEL has given him repeated opportunities to share his version of what happened back in 2009. In addition to emails confronting him with the reporting results, DER SPIEGEL has also asked him many times for in-person interviews. All of these attempts have been rejected, including the most recent attempt. One of Ronaldo's lawyers merely responded that all reporting on the subject is unlawful.

But it looks as though Ronaldo will, in fact, have to revisit the case and speak about what happened on that night in Las Vegas nine years ago. In the last several weeks, the police have spoken with Kathryn Mayorga on several occasions and questioned her again.

The Nevada criminal code includes the following statute: If a sexual assault has been documented in time by the police, it will never fall under the statute of limitations.

**By Rafael Buschmann, Andreas Meyhoff, Nicola Naber, Gerhard Pfeil, Antje Windmann, Christoph Winterbach and Michael Wulzinger**

**URL:**

https://www.spiegel.de/international/cristiano-ronaldo-kathryn-mayorga-the-woman-who-accuses-ronaldo-of-rape-a-1230634.html

**Related SPIEGEL ONLINE links:**

Rape Allegations Against Real Madrid Star: 'It Has To Be Less!' Ronaldo Wrote in Text Message (04/27/2017)
https://www.spiegel.de/international/business/rape-allegations-against-real-madrid-star-ronaldo-it-has-to-be-less-a-1144878.html

DER SPIEGEL Exclusive: Cristiano Ronaldo's Secret (04/19/2017)
https://www.spiegel.de/international/zeitgeist/der-spiegel-football-leaks-exclusive-cristiano-ronaldo-rape-allegation-a-1143910.html

© SPIEGEL ONLINE 2018

All Rights Reserved

Reproduction only allowed with permission